**Wayne A. Lamb - Law**
Wayne Lamb
183B High St NE
Salem, OR 97301
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

Attorneys for Plaintiff

UNITED STATED DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| PATRICIA "TRISH" NEMETH, individually and as the personal representative of the ESTATE OF JESSE BANKS,<br><br>        Plaintiff,<br><br>      vs.<br><br>OREGON DEPARTMENT OF CORRECTIONS  (ODOC);<br>OREGON STATE PENITENTIARY (OSP);<br>COREY FHUERE, Superintendent;<br>DEFENDANT D. WILSON, assistant Superintendent;<br>RICHARD PARDILLA (MD), individually;<br>KA RIN JOHNSON LCSW, QMHP, individually;<br>BERNADETTE LOUISE HUARD, MD., individually;<br>DR. DON DRAVIS (Chief of Psychiatry), individually;<br>ARMA YBARRA (MSW, QMHP), individually;<br>JESSICA RAUSIN (MS, QMHP), individually;<br>TABITHA DRAGO, R.N., individually,<br>OFFICER MICHAEL PRASKA, individually;<br>CORPORAL DUSTIN JOHNSON, individually;<br>OFFICER HOLLY BURGHARDT, individually;<br>OFFICER TRAVIS BANNING, individually; | Case No.<br><br>COMPLAINT<br><br><br><br>Wrongful Death<br>American Disabilities Act<br>Civil Rights Violations<br>1st Amendment Freedom of Speech<br>8th Amendment Failure to Protect<br>14th Amendment, Due Process<br><br>42 U.S.C. § 1983<br><br><br><br>*(Damages request for $20,000,000, exceeding $10,000 and not subject to mandatory arbitration)* |

PAGE 1    COMPLAINT

**WAYNE A. LAMB LAW, LLC**
1915 S Church St.,
Dallas, OR 97338
Telephone: 503-877-2227
Email: wayne@wlamblaw.com



OFFICER NICK MARTIN, individually;
LIEUTENANT PAUL WRIGHT, individually;
OFFICER J. MCKINNEY, individually;
K. VAN HOUTEN, individually;
OFFICER D. SMITH, individually;
OFFICER ALEX WAGNER, individually,

_____ Defendants.    Jury Trial Demanded

## INTRODUCTION

This case is about the tragic premature death of Jesse Banks, a young man in his mid-thirties, who with 'good time' had less than two years left on his 37-month, prison sentence. Jesse Banks' life was taken by the intentional, reckless, and deliberately indifferent actions of the personnel of the Oregon Department of Corrections (ODOC). He had frequent calls with family and letters to friends that always suggested optimism for his release, plans for continued magazine subscriptions, and plans to work with his uncle upon his release.

The guards routinely picked on Mr. Banks, and the mental health staff ignored him and his desires and complaints of certain medications, as well as his communications about certain medications that he was allergic to.

Mr. Banks suffered from a pervasive developmental disorder. Even though ODOC was notified of Mr. Banks' disability, he was denied necessary accommodations, and was placed in disciplinary segregation for the majority of his sentence where his mental health continued to deteriorate. In addition to denying Mr. Banks any reasonable accommodation, the Oregon State Penitentiary (OSP) personnel completely failed to follow its own policies and procedures along with Oregon's Administrative Rules on Behavioral Health Units and AICs in segregation. Those rules are specifically designed to prevent unexpected in custody deaths, requiring 15-minute and 30-minute tier

**WAYNE A. LAMB LAW, LLC**
1915 S Church St.,
Dallas, OR 97338
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

checks, respectively.

Additionally, OSP personnel failed to do anything to control the obvious need for security checks on mentally ill persons. The death investigation of Jesse Banks was significantly hampered by the State's own medical examiner by either refusing to note or completely ignoring evidence found at the investigation or during the autopsy. The evidence was critical to the finding of "suicide." Oregon State Police Detective Dunleavy noted that he watched the autopsy performed by Dr. Millius. He observed:

> **" An N-95 mask was found in the mouth of the decedent. It was ripped in half, with one half rolled-up inside the other and stuffed in the back of the mouth. The outside half of the mask was reddish-brown in color."**

Dr. Millius did not note anywhere in her autopsy that there was a bloody N-95 mask was crammed in the back of Jesse Banks' mouth. There is no mention of an N-95 mask. There is no mentioned of a mask ripped in two and one side neatly rolled inside of the other. There is no mention of blood or fluid in the mouth, which would indicate a higher likelihood of murder, rather than suicide. In the autopsy, there is no mention of anything in the throat. Verbatim, her report reads, "Neck: the upper airway is not obstructed." Either, The State, and Dr. Millius intended to bury evidence, or there was a complete lack of diligence or desire to determine the actual cause of death.

Additionally, the body of Jesse Banks was found in a position that would not suggest self-harm. His position would not have restricted leverage for "self-inflicted hanging." Tier checks were required every thirty minutes and were ordinarily performed as such, except for the 90 minutes before breakfast where Mr. Banks did not answer for breakfast, immediately followed by a 174-minute interval before Officer Praska found his body where no tier checks were performed for four hours and twenty-six minutes. Those

**WAYNE A. LAMB LAW, LLC**
1915 S Church St.,
Dallas, OR 97338
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

gaps in time were in spite of a clear policy to perform checks every fifteen minutes for high-risk persons and thirty minutes for segregated individuals. Detective Wagner did not check on Jesse Banks when he did not answer for breakfast on the morning when Jesse Banks was found dead in his cell.

On a medical psychiatric tier, whether Jesse Banks was murdered in his cell by a guard, or whether the death was a suicide due to failure to perform welfare checks during extreme dosage increase is of no consequence. The state actors were deliberately indifferent to the serious medical needs of Mr. Banks, either by strangling him to death, increasing his dosage to a fatal dose, and then leaving him unattended for several hours while they had the responsibility to perform tier checks every 15 minutes.

It appears that OSP has turned a blind eye to a real need for mental health care and the State of Oregon through its various departments and has acted complicitly in the cover up of evidence. The day after the medical examiner failed to report the N95 mask, Jesse Banks was scheduled for cremation. Jesse Banks' mother, Trish Nemeth, was contacted on April 3rd, as Jesse Banks' body was already in process for cremation.

Two undissolved pills ("Invega") were found in Mr. Banks' stomach. Those pills were given to Mr. Banks in addition to Invega injections that he had been prescribed. Those injections are supposed to occur monthly and are typically intended to "supplant" or be used "in place of" Invega pill prescriptions, not to be used "in addition to."

However, OSP medical staff elected to administer both – and then some. Jesse Banks was prescribed an increased dosage of 12mg of Invega orally (daily). He was additionally prescribed involuntary injections of Invega of 234mg (once to start the regimen) and 156 mg (monthly, thereafter). The amount he was prescribed exceeded

**WAYNE A. LAMB LAW, LLC**
1915 S Church St.,
Dallas, OR 97338
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

medical norms. But, even more, he was administered 256mg on 3/22, 256 on 3/27, and he was administered a 3rd massive dose on 3/29, two days before his death to go along with his 12mg nightly dose.

Jess Banks was left on the pill form of the drug with increased dosage from 6mg, to now 12mg. He was simultaneously prescribed the injection style of Invega. Mr. Banks' prescription regimen was a forced regimen (aka "nonconsensual") and "prescribed" to take involuntary pills in addition to involuntary injections, which caused an overdose of the medication.

In sum, Plaintiff asserts that Mr. Banks was killed in his cell by asphyxiation by a state employee when the N-95 mask was "stuffed" into the throat of Jesse Banks and buried as evidence of the autopsy. Alternatively, Dr. Huard altered Mr. Banks' medication in the week before his death, it was deliberately indifferent to Mr. Banks' serious medical needs to ignore the need for continuous observation during that period, or at minimum, fifteen-minute tier checks during the extreme variance in psychotropic dosage. Additionally, Dr. Huard & administering staff forced an overdose by administering an additional 'booster' dose of Invega that may have triggered a suicide, even if there was no previous thoughts of suicide. Again, the failure to perform tier checks every fifteen-minutes contributed to Mr. Banks' death in light of the drastic change in psychiatric medication.

Whether the death was suicide or guard strangulation, the death was the product of a criminal act of intent or recklessness and each named actor is culpable for the death through the original prescription, the administering the overdose prescription, or by the killing or failure to perform the tier checks under Oregon law.

**WAYNE A. LAMB LAW, LLC**
1915 S Church St.,
Dallas, OR 97338
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL LAW

JURISDICTION

1.      This court has jurisdiction over the subject matter of this Complaint under

42 U.S.C. §§ 1983 and 12101 et seq., and 28 U.S.C. §§ 1331, 1343(a)(3), and

1343(a)(4). Pendent jurisdiction is asserted for a separate state law claim under 28 USC

§ 1367.

VENUE

2.      Venue is proper within the District of Oregon because all of the events

giving rise to this claim occurred in this judicial district, and all Defendants reside in this

judicial district. 28 U.S.C. § 1391(b). Specifically, all of the acts and practices alleged

herein occurred at Oregon Department of Corrections Facilities in Salem, Oregon.

PARTIES

3.      **Decedent, Jesse Michael Banks**, was an adult in custody ("AIC"), lodged

at Oregon State Penitentiary (OSP), located at 2605 State St, Salem, OR 97310. During

the relevant period, Mr. Banks was under the care, custody, and control of the

Defendants.

4.      **Plaintiff, the Estate of Banks**, by and through the Personal

Representative for the Estate, Trish Nemeth, is an adult currently residing in 264 Buzz

St., Unit 21, Branson, MO 65616. Trish Nemeth is the mother of the decedent, Jesse

Michael Banks, and she is the personal representative of the Estate of Jesse Banks and

brings this lawsuit as personal representative on behalf of the Estate of Jesse Banks

pursuant to ORS 30.020.

5.      **Plaintiff Patricia Nemeth**, aka Trish Nemeth is an adult currently residing

in Branson, Missouri. Ms. Nemeth is the mother of decedent Jesse Michael Banks, is

**WAYNE A. LAMB LAW, LLC**
1915 S Church St.,
Dallas, OR 97338
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

the personal representative of the Estate of Jesse Banks, and brings this lawsuit individually and on behalf of the Estate of Jesse Banks pursuant ORS 30.020.

6.      **Defendant, Oregon Department of Corrections (ODOC)** is an administrative agency of the State of Oregon. Defendant was acting at all relevant times in the scope of its administrative capacity and under color of Oregon State law.

7.      **Defendant, Oregon State Penitentiary**, located at 2605 State St, Salem, OR 97310, is a facility operated and funded by ODOC, an administrative agency of the State of Oregon. OSP was acting at all relevant times in the scope of its administrative capacity and under color of Oregon State law.

8.      **Defendant Corey Fhuere** is the superintendent of the Oregon State Penitentiary ("OSP") and an employee of the Oregon Department of Corrections. He is sued in his individual, supervisory and official capacity. As superintendent, Mr. Fhuere is ultimately responsible for all aspects of a well-run institution. As such, he is responsible for directing the daily operation of the institution in compliance with federal statutes, correctional case law, and ODOC rules and procedures. At all times relevant, Mr. Fhuere was acting under color of state law.

9.      **Defendant D. Wilson** is the assistant superintendent of the Oregon State Penitentiary ("OSP") and an employee of the Oregon Department of Corrections. He is sued in his individual, supervisory and official capacity. As superintendent, Mr. Wilson is ultimately responsible for all aspects of a well-run institution. As such, he is responsible for directing the daily operation of the institution in compliance with federal statutes, correctional case law, and ODOC rules and procedures. At all times relevant, Mr. Wilson was acting under color of state law.

**WAYNE A. LAMB LAW, LLC**
1915 S Church St.,
Dallas, OR 97338
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

10.     **Richard Pardilla (MD)** is a licensed mental health worker who was brought in as an independent physician by ODOC and is sued in his individual capacity. At all times relevant, she was acting under color of state law. (Banks – Med & Death - 000167)

11.     **Ka Rin Johnson (LCSW, QMHP)** is a licensed mental health worker who is employed by ODOC and is sued in her individual capacity. At all times relevant, she was acting under color of state law. (Banks – Med & Death - 000167)

12.     **Dr. Bernadette Louise Huard, MD,** is a mental health worker who is employed by ODOC and is sued in his individual capacity. He/She, as of the date of Mr. Banks' death, had been a Mental Health Specialist at ODOC at relevant times. Although Dr. Huard has no license to practice psychology, ODOC has entrusted him to diagnose and treat behavioral, emotional, and mental disorders. At all times relevant, Dr. Huard was acting under color of state law.

13.     **Dr. Don Dravis** is a mental health worker who is employed by ODOC and is sued in his individual capacity. He was the Chief of Psychiatry at ODOC at relevant times. Mr. Dravis was entrusted by ODOC to diagnose and treat behavioral, emotional, and mental disorders. At all times relevant, Ms. Dravis was acting under color of state law. (Banks – Med & Death - 000164)

14.     **Arma Ybarra (MSW, QMHP)** is a licensed mental health worker who is employed by ODOC and is sued in her individual capacity. At all times relevant, she was acting under color of state law. (Banks – Med & Death - 000167)

15.     **Jessica Rausin (MS, QMHP),** is a licensed mental health worker who is employed by ODOC and is sued in her individual capacity. At all times relevant, she

**WAYNE A. LAMB LAW, LLC**
1915 S Church St.,
Dallas, OR 97338
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

was acting under color of state law. (Banks – Med & Death - 000167)

16.      **K. Van Houten** is a Mental Health Infirmary Coporal who is employed by ODOC and is sued in his individual capacity. At all times relevant, she was acting under color of state law.

17.      **Tabitha Drago, R.N.** was employed as the medical services manager (MSM) of OSP during the relevant time periods and is sued in his individual capacity. The MSM is the delegated, on site, medical operations authority. At all times relevant, Nurse Randall was acting under color of state law.

18.      **Officer M. Praska** was employed as a correctional officer at ODOC and is sued in his individual capacity. During all relevant time periods, he was a correctional officer in the DSU at OSP. At all times relevant, Officer Praska was acting under color of state law.

19.      **Corporal D. Johnson** was employed as a correctional officer at ODOC and is sued in his individual capacity. During all relevant time periods, he was a correctional officer in the DSU at OSP. At all times relevant, Officer Johnson was acting under color of state law.

20.      **Officer H. Burghardt** was employed as a correctional officer at ODOC and is sued in his individual capacity. During all relevant time periods, he was a correctional officer in the DSU at OSP. At all times relevant, Officer Burghardt was acting under color of state law.

21.      **Officer T. Banning** was employed as a correctional officer at ODOC and is sued in his individual capacity. During all relevant time periods, he was a correctional officer in the DSU at OSP. At all times relevant, Officer Banning was acting under color

**WAYNE A. LAMB LAW, LLC**
1915 S Church St.,
Dallas, OR 97338
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

of state law.

22.    **Officer N. Martin** was employed as a correctional officer at ODOC and is sued in his individual capacity. During all relevant time periods, he was a correctional officer in the DSU at OSP. At all times relevant, Officer Martin was acting under color of state law.

23.    **Lieutenant Paul Wright** was employed as a correctional officer as the officer in charge at ODOC and is sued in his individual capacity. During all relevant time periods, he was a correctional officer in the DSU at OSP charged with overseeing the officer's in BHU. At all times relevant, Lieutenant Wright was acting under color of state law.

24.    **Officer J. McKinney** was employed as a correctional officer at ODOC assigned to the post of BHU control center, and he is sued in his individual capacity. During all relevant time periods, he was a correctional officer in the BHU at OSP. At all times relevant, Officer McKinney was acting under color of state law.

25.    **Officer A. Wagner** was employed as a correctional officer at ODOC and is sued in his individual capacity. During all relevant time periods, he was a correctional officer in the DSU at OSP. At all times relevant, Officer Wagner was acting under color of state law.

## STATEMENT OF FACTS

1.  **BACKGROUND**

26.    In 2018, Jesse Banks went to prison at Oregon State Penitentiary (OSP) for 38 months. He was housed in the behavioral health unit (BHU), where he received continuous mental health evaluations and treatment.

**WAYNE A. LAMB LAW, LLC**
1915 S Church St.,
Dallas, OR 97338
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

27.     He was again sentenced in 2022 on felony charges, where he received

another 36 months in ODOC. He was again sent to OSP, and he was again housed in

BHU, where he received another round of continuous mental health evaluations and

treatment, until April 1, 2023, when he was found dead in his cell, which was deemed a

suicide.

28.     Jesse Banks was charged with four counts of aggravated harassment and

one count of assaulting a public safety officer on December 9th, 2021. Jesse Banks was

homeless when he was arrested and prior to the arrest he had been homeless off-and-

on for years.

29.     Mr. Banks had eleven criminal cases from 2006 to 2021. In all cases

involving felony charges after 2006, his mental health concerns were raised by the court

or his attorneys. The only cases that show no record of mental health concerns were

misdemeanor cases, which oftentimes have less interaction between client and

attorney. Jesse Banks was found unfit at to proceed in his cases on several occasions.

He was found unfit on a 2014 case, again on a 2015 case, and more recently, he was

found unfit to proceed on criminal cases in 2018 and 2021.

30.     In 2018, he was found unfit in Washington County, but his mental health

was restored at OSH, so he was competent to stand trial. He did stand trial, and he was

sentenced to 38 months on Felony charges. He was transported to Oregon State

Penitentiary, where he was housed in BHU.

31.     In 2021, Mr. Banks was found unfit to proceed and ordered dismissal in

Washington County for a misdemeanor offense.

32.     Again in 2021 only a few months later, in Case No. 21CR59929, Jesse

**WAYNE A. LAMB LAW, LLC**
1915 S Church St.,
Dallas, OR 97338
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

Banks was found unfit to aid and assist his attorneys, but later he was restored to a level that was considered "competent to stand trial" in Marion County on felony charges.

33.    He was ultimately sentenced to three years in ODOC, and that was the case that landed him back in Oregon State Penitentiary, housed again in BHU, in cell 34, where he died.

34.    Aid and assist concerns were raised in every felony case by every attorney who represented Mr. Banks after 2006.

35.    Jesse Banks was found unfit to proceed in a misdemeanor case in Washington County on March 25, 2022.

36.    During that case, he was in jail for several months and released to the community under supervision and care.

37.    That recommendation was made by OSH during their observation of Mr. Banks during his incarceration from May 2022 to November 2022.

38.    Only a few months later, Mr. Banks was found fit to proceed on felony charges in Marion County, where he was sentenced to three years in prison.

39.    Mr. Banks was transported to OSP where he eventually died in his cell. OSP had ample information of Jesse Banks' mental health history through its own investigations and evaluations of Mr. Banks and from his prior ODOC stint.

40.    Mr. Banks was transported to OSP for his developmental disability during his prior prison sentence, and he was in OSP on this occasion for those things that had occurred while he was in the BHU on his 2018 sentence.

41.    It had additional knowledge through its communications with OSH and through the information delivered to it by the sentencing court.

**WAYNE A. LAMB LAW, LLC**
1915 S Church St.,
Dallas, OR 97338
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
L A W

42.     Additionally, OSP had a history with Jesse Banks through Mr. Banks' previous incarceration at OSP in 2018 for several years.

43.     OSP and its guards and medical providers had a long history of interaction with Mr. Banks.

44.     Jesse Banks remained incarcerated until his conviction on 10/31/2022, and he was transported to Oregon State Penitentiary upon conviction, where he remained until his death in the middle of the night on March 31, 2023, or the morning of April 1, 2023. The rigor mortis observed, combined with the undissolved pills in the stomach will allow the parties to identify whether he died just after dinner or just after breakfast.

45.     There was an encounter, a month prior to Mr. Banks' death, on or around February 23, 2023. Mr. Banks tied his blankets around the door in a way that blocked the door from opening.

46.     The officers present at that encounter were the following officers:

   a.  Officer Ruiz,
   b.  Officer R. Hedges
   c.  C/O S. Pries
   d.  Officer D. Urbach (Officer in Charge)
   e.  **Officer Banning,**
   f.  Officer R. Gowey
   g.  **Corporal D. Johnson,**
   h.  **Officer M. Praska**, and
   i.  Lieutenant E. Trimble.

   ***Bold Denotes Officers known to be at both scenes***

47.     Officer Ruiz sent tear gas into the cell to get Mr. Banks out from under his bed and to exit his cell. That was the action that concluded the encounter. Mr. Banks came out from under his bed and submitted to restraints.

**WAYNE A. LAMB LAW, LLC**
1915 S Church St.,
Dallas, OR 97338
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

48.     As an additional measure, Mr. Banks was issued a deprivation order where he was not permitted blankets, sheets, or towels.

49.     A month later, Jesse Banks was found dead, and the following officers were at the scene and responsible to ensure tier checks were performed:

> **j.   Officer Praska**
> **k.   Corporal D. Johnson**
> l.   Officer H. Burghardt
> **m. Officer T. Banning**
> n.   Officer N. Martin
> o.   Officer B. Lohrman
> p.   Officer D. Smith
> q.   Officer J. McKinney
> r.   Officer K. Van Houten
> s.   Corporal B. Griffith

> *\*\*\*Bold Denotes Officers known to be at both scenes\*\*\**

50.     Officers Praska, Officer Banning and Corporal D. Johnson were both present at both encounters. Each was present at the scene on the day of death and questioned by Detective Dunleavy.

51.     Each of the officers listed were personally responsible for tier checks on the day when Jesse Banks died, and each personally ignored their duties to perform tier checks on BHU on the night and/or morning that Mr. Banks died.

**2.  CIRCUMSTANCES OF DEATH**

52.     Jesse Banks was found on his bunk on his stomach on April 1, 2023. His body was completely covered by his blanket,

53.     Mr. Banks' hands were positioned in a way that would not provide leverage for a person desiring to "hang" themselves.

54.     There are post-mortem factors that indicate that Jesse Banks died by strangulation, rather than by suicide.

**WAYNE A. LAMB LAW, LLC**
1915 S Church St.,
Dallas, OR 97338
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

55.    There were several facts that indicate that the death resulted from a killing, rather than suicide:

56.    **An N-95 mask was found in Jesse Banks' throat** (the Forensic Examination Report suggests that the Medical Examiner did not know that there was an N-95 mask in the decedent's throat because it is entirely omitted from the report).

    a.  The blood stain on the mask is another marker ("reddish-brown" in color).

    b.  Another marker is that the mask was ripped in half with one half of the mask rolled up and folded into the other half of the mask, and "stuffed" into the back of the mouth.

57.    **Jesse Banks' body position**: He was found under his blankets, hidden from sight. Oregon State provides standard 6' blankets. Jesse Banks was 5'11". His hand was outstretch, extended straight over his head, which would make a foot-and-a-half of his body visible from the door. He could not be seen from the door in the way he was positioned, according to Officer Reports and according to questioning by Detective Dunleavy.

    c.  "he was found prone position with his hands under his torso."

    d.  However, Officer Martin stated in his report as follows: "As the blanket was further removed <u>I could see the hand of AIC banks was stuck in the stretched out position above his head and was purplish black</u>," right after Officer Martin said, "He is cold."

58.    Two Blankets:

    e.  Detective Dunleavy found two blankets outside the door of Jesse

**WAYNE A. LAMB LAW, LLC**
1915 S Church St.,
Dallas, OR 97338
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
L A W

Banks' cell. One was torn and the other was not. Mr. Banks had a

deprivation order for sheets and towels issued on 2/28/23 due to his

incident on 2/23/23 when he tied the door shut.

### 3. MEDICAL

59.     Mr. Banks was found strangled in his cell. The autopsy shows that the

strangulation was self-inflected, but the autopsy relies on a flawed investigation

because it was not provided the proper evidence to make its findings.

  f.   The two major things ignored by the autopsy were: Jesse Banks was

       not found in the position that is written in the medical examiner report.

  g.   There was an N-95 mask found in the throat of the decedent. It is

       unclear whether the medical examiner ever saw this mask.

60.     Plaintiff will be able to point to exactly who was responsible for the death

after discovery is produced to the Plaintiff. Defendant can establish the exact time of

death based on the undissolved pills that were found in his stomach by the medical

examiner, combined with video footage on the tier, and interviews or depositions.

61.     Dr. Huard's mental health notes from his interviews with Jesse Banks

repeatedly shows that Jesse Banks was not suicidal, nor did he convey any ideas or

thoughts of self-harm. The day before Jesse Banks' death, Dr. Huard noted that there

were no suicidal thoughts or tendencies.

62.     Jesse Banks was under Dr. Huard's care for many months. Recently,

Jesse Banks had been placed on involuntary medication.

63.     Any suicidal inclinations on the weeks leading up to the death were

induced by involuntary overdose of medication.

WAYNE A. LAMB LAW, LLC
1915 S Church St.,
Dallas, OR 97338
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

64.     On 12/13/2022, four months before Mr. Banks' death, Officer Duarte was working his assigned post as the Behavioral Health Unit (BHU) Officer on 2nd shift.

65.     At approximately 6:05am, he was on the top tier in Section 2 where Jesse Banks was housed, collecting trays from the morning meal.

66.     When Officer Duarte arrived at the cell front of BHU-34, solely occupied by Adult in Custody (AIC) Banks, Jesse (SID: 16045075), Officer Duarte opened the cuff port and asked Jesse Banks if he would hand him his tray.

67.     AIC Banks was sitting on his bunk and loudly stated "Who are you!" "What is your name!"

68.     Officer Duarte then asked Mr. Banks to hand him his tray and Mr. Banks drew his head backwards and spit at Officer Duarte from his bed.

69.     Officer Duarte proceeded to file a complaint and sought disciplinary action.

70.     While the action taken stated no punitive segregation action would be taken, Jesse Banks was ultimately placed into segregation, stripped of many necessities and basic luxuries provided to other AICs, and the event triggered steps within the facility to place Jesse on involuntary medication.

71.     Dr. Huard noted, two weeks before the implementation of involuntary medication that Mr. Banks "is not willing to have a conversation about med risks and benefits. He received consistent med education during previous incarceration about risks/benefits."

72.     He notes that Mr. Banks was willing to take meds for depression and anxiety but not antipsychotics. There are several notes that Jesse Banks did talk about his symptoms, discussed his allergic reactions to certain medication, and how certain

**WAYNE A. LAMB LAW, LLC**
1915 S Church St.,
Dallas, OR 97338
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

medications made him feel weird.

73.    Dr. Huard was responsible for the medication regimen and oversaw the

implementation of his orders and prescriptions, administration of medication, and he

oversaw the nurses who distributed medication each individually participated in Mr.

Banks' forced medication regimen.

74.    Dr. Don Dravis was responsible for oversight on those same matters.

75.    Ka Rin Johnson, LCSW, OMHP, was told by Jesse Banks that his mental

health declined when his medications changed, which resulted in a manic episode and

eventual relapse on substances. He personally informed her of the danger of drastic

medication changes, and she and Dr. Huard worked together to substantially and swiftly

shift Jesse Banks' medication regimen. Jesse Banks even discussed a suicide attempt

a few years prior with Ka Rin Johnson and Dr. Huard.

76.    Further, when other medical providers performed the progress notes

during the "bad times" of Jesse Banks mental treatment, the outcomes were

substantially different than the template records of Ka Rin Johnson and Dr. Huard:

a. "Mr. Banks presented calm with restricted affect. He was fully oriented.

Eye contact appropriate. Speech slow and monotone. Expressed

thoughts linear, clear and goal directed, staying along themes of his

phone access and code, football and historical childrood and family

information. Negative for SI/HI. Denied AVH. Devoid of Delusional

thought content. Insight into his mental illness, poor. Judgment of

choices today, fair. (1/25/23, Arma Ybarra, MSW, OMHP).

b. Met cell side on 12/26/22 and he was cooperative and polite. He

**WAYNE A. LAMB LAW, LLC**
1915 S Church St.,
Dallas, OR 97338
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

appeared to be oriented to time, place, person, and purpose.

77.     In 16 recorded conversations over the prior month leading up to Mr. Banks' death, he was showered with love, attention, and affection from his family. He spoke of the future, of work, of National Geographic subscriptions, and he generally spoke with optimism and level-headedness.

78.     Jesse Banks did have a developmental disorder. The apparent disorder sounds far less substantial than the copy-and-paste documents submitted by the medical staff.

79.     Jesse Banks had a mental level of competence high enough to make his own medically informed decisions.

80.      Jesse Banks died, either by his own hands as the product of improper medication changes, improperly administered injections, and insufficiently sporadic tier checks during the short period leading up to his death, combined with bullying and abuse, or by the hands of the facility personnel.

81.     Nurses Tabitha Drago, Emily Lill were the nurses who responded to the cell when the officers reported that there was an emergency in Jesse's cell that required medical assistance.

82.     The active medical staff was responsible for inmate safety on the BHU. They did not perform their safety function to ensure tier checks were performed every 15 minutes of Jesse Banks, while he was at a heightened risk – a risk that they created.

83.     K. Van Houten was the Corporal assigned to the Post as Mental Health Infirmary (MHI) Corporal, and he did not perform the requisite tier checks as required by rule in his role at the BHU or ensure that those tier checks were performed.

**WAYNE A. LAMB LAW, LLC**
1915 S Church St.,
Dallas, OR 97338
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

84.     Officer Wagner personally performed the tier checks, and personally failed to perform a number of tier checks during the relevant period leading up to Jesse Banks' death.

### 4.  OFFICERS' ACTIONS AND INACTION

85.     All guards who were responsible for the AICs in BHU each knew that BHU was a "Behavioral Health Unit" which housed AICs with mental health problems and developmental disorders.

86.     Over the previous several months, the guards had encounters with Mr. Banks.

87.     Mr. Banks grieved against Officer Duarte and Wagner for ignoring him when it was time for his haircut.

88.     Mr. Banks had written, "Duarte sucks dick for Tea Bags and Golden Tips" on his cell wall. He had complained to his mother of his food tasting like urine.

89.     Mr. Banks grieved against Officer Johnson for ignoring him when he informed him that he was not a physical threat and was back to full restraints, even though his medical charts reflect the absence of physical threat or violence and reflect a mental health patient who had made substantial progress with conduct and communications, per the ODOC Behavioral Health Services Progress Note on 2/27/2023 by Ka Rin Johnson.

90.     Mr. Banks Grieved against Officers "Kieth, Johnson, Teal, and 3 others" because the officers grabbed the ankle cuffs and handcuffs and yank them hard to "play head games" with him.

91.     He informed the facility that "the MR is wrong; I don't have shower shoes; I

**WAYNE A. LAMB LAW, LLC**
1915 S Church St.,
Dallas, OR 97338
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

got fed up being picked on by staff; I heard him; I tied the door shut."

92.    The guards maced him in his cell on 1/14/23.

93.    Guards who walked the tier on the night of his death are required to show that they performed a tier check by filling out a Behavioral Health Unit (BHU) Tier Patrol Log.

94.    Officer Alex Wagner, Corporal Dustin Johnson (#462), and Officer Danny Johnson (#348) checked the tier approximately every 36 minutes from midnight, until Jesse Banks' death. The policy of the facility is to check tier's every 30 minutes.

95.    The policy of AICs with a high risk of suicide is every 15 minutes.

96.    Nonetheless, the officers allowed one 90-minute interval to pass and an interval of 174 minutes without a tier check on the behavioral health unit, during the hours leading up to the death, while Mr. Banks was in solitary confinement and while he was a high suicide risk due to their fatal doses of medication the week of his death.

97.     Mr. Banks had his mental health medications changed substantially and frequently.

98.    The medical records of Mr. Banks recent mental health treatment suggests that he was given a potentially fatal dose of the psychotropic drug, Paliperidone (Invega, oral; Invega Sustenna, Injection) on the eve of his death.

99.    The records also show that he was given an additional dose of Paliperidone in the pill form on the night of his death. The autopsy by Dr. Millus shows there was an undissolved pills in his stomach.

100.    The doctors and nurses previously named were in charge of those prescriptions and tier nurses were in charge of administration.

**WAYNE A. LAMB LAW, LLC**
1915 S Church St.,
Dallas, OR 97338
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

101.    The Officers on the tier were charged with performing tier checks on the mentally ill AICs in BHU, including Jesse Banks at BHU34.

102.    Officer Wagner went to Jesse Banks cell to deliver breakfast and Jesse did not answer.

103.    On 4/1/23, at approximately 9:45AM, Officer M. Praska was working as the Behavioral Health Unit Officer. Officer M. Praska was delivering lunch to BHU Section 2 on the top tier, which was where Jesse Banks (SID#16045075) was housed. Ofc. Praska asked Mr. Banks multiple time if he wanted his food. Mr. Banks did not respond to Officer Praska.

104.    Officer Praska could see that Banks was laying on his bunk in a sleeping position. AIC Banks was completely covered by his blanket and his head was away from the cell door and positioned near rear wall.

105.    Praska kicked the cell door to wake Mr. Banks. Mr. Banks did not respond. Officer Praska checked to see if Banks was breathing, but he could not tell from the cell door.

106.    Officer Praska asked Corporal D. Johnson for his assistance.

107.    Corporal D. Johnson and Officer H. Burghardt responded to the cell, and met Ofc Praska in front of Jesse's cell (BHU34).

108.    Corporal D. Johnson and Officer M. Praska continued to yell Banks name to try and wake him up.

109.    Corporal D. Johnson nor Officer Praska could tell if Banks was breathing.

110.    Officer H. Burghardt used her radio and notified Lieutenant P. Wright that a welfare check was need in BHU. Lieutenant P. Wright, Officer Banning and Officer N.

**WAYNE A. LAMB LAW, LLC**
1915 S Church St.,
Dallas, OR 97338
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

Martin responded to the cell front of BHU34.

111.    Once enough staff were present, the cell door was opened.

112.    Officer Banning entered the cell with a Lexan shield for staff safety.

113.    Officer Banning gently placed the shield on AIC Banks as a precaution measure.

114.    Officer N. Martin gained control of AIC Banks ankles.

115.    Officer N. Martin stated that AIC Banks was cold. Staff then pulled the blanket away from Banks face.

116.    Staff noticed that Banks face was purple, and he was not responsive. Officer Burghardt used her radio to initiate ICS.

117.    Officer Burghardt requested additional staff and the AED.

118.    Officer Banning noticed that AIC Banks had a piece of a state issued blanket wrapped tightly around his neck.

119.    Officer Banning retrieved a cutdown tool. Together with Officer Praska, they removed the blanket from AIC Banks neck.

120.    Medical staff responded to cell BHU34 and 911 was called by Master Control.

121.    AIC Banks was move to his back and medical staff began giving CPR to AIC Banks.

122.    Once the AED arrived AIC Banks was moved from the bed to the floor so staff could have a firm surface to continue CPR.

123.    They stated that they did CPR, but they did not check the airway, which is one of the first things a medical professional performs upon performing CPR.

**WAYNE A. LAMB LAW, LLC**
1915 S Church St.,
Dallas, OR 97338
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL LAW

124.    The AED was initiated, and it prompted Officer Banning to remove Banks' clothing to expose his bare chest.

125.    Officer Banning used the cut down tool to cut the state issued clothing away from Banks' chest.

126.    Once on the ground the AED pads were applied to Banks' chest while chest compressions were continually given.

127.    The AED assessed AIC Banks and prompted staff not to touch Banks.

128.    The AED did not advise shock to AIC Banks.

129.    Medical and security staff continued to give CPR to AIC Banks until EMS arrived.

130.    Some officers note that CPR was given.

131.    Officers also allege that Jesse Banks' body had gone completely cold.

132.    They stated he was purple and black from rigor mortis.

133.    They stated that he was completely stiff and rigid from rigor mortis – so much rigidity that he was hard to move to the floor, yet it is claimed that they gave him CPR. Whether true or not, it was clearly too late, as Mr. Banks was pronounced dead at 10:07 a.m.

134.    The cell door was secured with AIC Banks inside of cell BHU34. Lieutenant P. Wright designated cell BHU34 a crime scene.

135.    Officer N. Martin was assigned to preserve the crime scene.

136.    A Crime Scene Contamination Log was initiated and utilized. At approximately 11:53AM, the Oregon State Police, Marion County Medical Examiner and District Attorney responded to cell BHU34 to investigate the incident. At approximately

WAYNE A. LAMB LAW, LLC
1915 S Church St.,
Dallas, OR 97338
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL LAW

1:10PM, the State Police cleared the crime scene. The State Police case number for

this incident is SP23093876.

137.    Once the crime scene was clear AIC Banks' body was placed on a

stretched and was escorted to SMH Intake. At approximately 2:45PM Crown Memorial

took possession of AIC Banks' body, and they transported him to the Oregon State

Medical Examiner's Office in Oregon City. The SMH Building remained on modified lock

down status due to low staffing and to give staff time to finish their paperwork. The staff

who were involved in this incident did not report any injuries. All staff who were involved

in this incident were afforded CISM. QMHP A. Myers conducted rounds in BHU to check

welfare of the AIC's living in the Behavior Health Unit.

138.    Jesse Banks had constant calls with his mother and grandma. They wrote

back-and-forth. Mr. Banks also had a handful of other family members who he wrote

back-and-forth.

139.    Mr. Banks had plans to go to work with his uncle upon his release and to

live with his uncle.

140.    There was no notes or anything showing that Jesse Banks was suicidal in

Mr. Banks' cell.

141.    There were sixteen calls of love and optimism in the final month of Jesse

Banks' life, and there was only a portion of a call where Jesse was overly sad. He had

Covid and was waiting to see the doctor, and he was afraid that the sickness was going

to be the end of him.

**OFFICERS AND AGENCIES**

142.    ODOC has certain obligations to oversee its subsidiaries and various

**WAYNE A. LAMB LAW, LLC**
1915 S Church St.,
Dallas, OR 97338
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL LAW

departments and to ensure compliance with state laws and rules and federal guidelines.

143.    It is tasked to ensure correctional facilities and medical facilities within those correctional facilities adhere to its own policies and procedures to ensure they provide adequate medical care and mental health care as established by its own guidelines and as enacted by law.

144.    Together, ODOC, OSP and its officers, COREY FHUERE, Superintendent, DEFENDANT D. WILSON, assistant Superintendent, Dr. Huard, have been tasked with the following obligations:

> h.    Implement a guide for staff to conduct appropriate and thorough tier checks to ensure inmate safety;
>
> i.    Implement a guide for staff to conduct tier checks every 15 minutes as required by OAR 291-76-020 or even 30-minute increments as required by OAR 291-11-30; and
>
> j.    Implement a guide for staff to conduct cell searches as required by OAR 291-11-30.

### FIRST CLAIM FOR RELIEF

**(Americans with Disabilities Act and § 504 of the Rehabilitation Act against D. Bernadette Huard, Ka Rin Johnson, Dr. Don Dravis, Arma Ybarra, Jessica Rausin, Tabitha Drago, directly; and additionally, ODOC, OSP, Corey Fhuere as supervisors tasked to implement administrative policy)**

145.    Plaintiff realleges paragraphs 1-144 and incorporates herein.

146.    The prisons comprising of the Oregon Department of Corrections have been recipients of federal funds and are thus covered by § 504's mandate, which requires recipients of federal money to reasonably accommodate disabled persons

WAYNE A. LAMB LAW, LLC
1915 S Church St.,
Dallas, OR 97338
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

within their facilities, program activities, and services, and reasonably modify such facilities, services, and programs to accomplish the intended purpose of the act. For the 2021-23 budget, ODOC received $2.2 billion dollars, and $2.3 billion dollars have been allocated for the 2023-25 adopted budget, including allocation of federal funds for this purpose.

147.    The prisons comprising of the Oregon Department of Corrections are public entities within the meaning of Title II of the ADA, and provide programs, services or activities to the general public. In its essence, Title II of the ADA is the same mandate as Section 504.

148.    At all times relevant to this action, Mr. Banks was a qualified individual within the meaning of Title II of the ADA. He met the requirements for eligibility and the receipt of the services, programs, or activities of ODOC. Specifically, Mr. Banks suffered from a mental impairment that "substantially limits one or more major life activities," including but not limited to "learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. §12102.

149.    The Oregon Department of Corrections provides housing, medical and mental health treatment, and work and educational programs to prisoners, which comprise programs and services for Section 504 and Title II purposes.

150.    Under the ADA, the Oregon Department of Corrections is required to ensure that developmentally disabled prisoners are properly identified in order to provide reasonable accommodations to those prisoners. Therefore, under the ADA, a tracking system is necessary to ensure that these disabled prisoners are properly identified.

**WAYNE A. LAMB LAW, LLC**
1915 S Church St.,
Dallas, OR 97338
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

151.    The Oregon Department of Corrections, and each of the named Defendants identified above, knew through its tracking system, through the mental health policies and progress notes, and by Mr. Banks' placement in BHU, that Mr. Banks suffered from a developmental mental health disorder. It was well documented that he suffered from Schizophrenia, as well as depression and anxiety.

152.    Under the ADA, the State may not exclude an individual from participation in or be denied benefits of the public entity's services, programs, or activities, or otherwise face discrimination from the public entity by reason of their disability. Alphonsis v. Century Reg'l Det. Facility, 2017 U.S. Dist. LEXIS 228013, Beadle v. Smolich, 2022 U.S. Dist. LEXIS 102558, Stuckey v. California, 2020 U.S. Dist. LEXIS 36641.

153.    In the context of prisons, this means that mental health patients must be provided with the same access to services, programs, and activities as other inmates. This includes making reasonable modifications to policies, practices, or procedures when necessary to avoid discrimination, unless such modifications would fundamentally alter the nature of the service, program, or activity. *Bozeman v. Santoro*, 2018 U.S. Dist. LEXIS 122861, *Alphonsis v. Century Reg'l Det. Facility*, 2017 U.S. Dist. LEXIS 228013, *Beadle v. Smolich*, 2022 U.S. Dist. LEXIS 102558.

154.    The Oregon Department of Corrections was deliberately indifferent in failing to provide Mr. Banks with reasonable accommodations and other services related to his disabilities, and denied him the rights and benefits accorded to other inmates, solely by reason of his disabilities in violation of the ADA and Rehabilitation Act in the following particulars:

WAYNE A. LAMB LAW, LLC
1915 S Church St.,
Dallas, OR 97338
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL LAW

a. The Oregon Department of Corrections is required to provide staff assistants to developmentally disabled prisoners in disciplinary proceedings, and also must ensure that those staff assistants or providing the prisoners with effective communication. Mr. Banks received no such accommodation.

b. The ADA and Rehabilitation Act require that prison staff try to counsel developmentally disabled prisoners rather than subjecting them to the disciplinary process when they break prison rules that they do not understand. Mr. Banks received no such accommodation.

c. The ADA and Rehabilitation Act require that developmentally disabled prisoners have access to adequate medical and mental health care. Mr. Banks was denied adequate mental health treatment.

d. The ADA and Rehabilitation Act require that developmentally disabled prisoners have access to ODOC programs, services, activities, work and educational opportunities. Mr. Banks received no such accommodation. Because he spent the vast amount of his incarceration at OSP in the BHU, he was denied virtually all programs, services, and activities available to the prisoners, e.g., exercise, yard time, games, television, socialization, job programs, educational opportunities, etc.

e. He was denied haircuts and actual responsiveness to his grievances and complaints. Instead, he was largely ignored whenever he voiced a concern or complaint, even when it related to his being allergic to a

**WAYNE A. LAMB LAW, LLC**
1915 S Church St.,
Dallas, OR 97338
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

particular drug or when it related to the pain of his handcuffs and ankle cuffs.

f.   He was denied the appropriate protective supervision that would avoid self-harm on the night of his death when the facility, medical staff, and officer tasked to escort those persons knew of the drastically changed medication and treatment and failed to protect the inmate by following its own safety precautions through 15-minute tier checks for high risk individuals and/or 30-minute tier checks for adults in segregation.

g.   Mr. Banks was placed in solitary confinement for extended periods despite clear administrative orders rejecting solitary confinement for punishment against people with developmental disorders.

h.   Mr. Banks was deprived of necessities that other inmates enjoyed like exercise and phone privileges, as well as his paperwork and writing items, so he was cut off from his friends and family at certain points in time by the facility's abusive measures.

i.   Nothing was ever effectively communicated to him regarding what was required of him to obtain a better standing and security rating in the facility so that he could get out of segregation, out of trouble and into a better custodial living situation.

j.   He was maced in his cell by Officer Ruiz when he locked himself in his cell to stop what Mr. Banks believed to be abusive measures taken by guards.

k.   He was bruised badly on his hands and ankles by excessive force

**WAYNE A. LAMB LAW, LLC**
1915 S Church St.,
Dallas, OR 97338
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
L A W

placed on to handcuffs and ankle cuffs that were too tight and that he had communicated were too tight and painful.

l.   He was picked on repeatedly for his mental disorder, and State of Oregon, ODOC, OSP, and the administrators and managers failed to train its officers on mental health disorder management.

155.   The Oregon Department of Corrections failed to enforce appropriate policies and procedures to ensure the provision of necessary accommodations, modifications, and/or services to inmates with developmental disabilities.

156.   The Oregon Department of Corrections and its Officers failed to train and supervise the prison personnel to provide necessary accommodations, modifications, services and or physical access to inmates with developmental disabilities.

157.   As a direct and proximate result of ODOC's foregoing wrongful acts, Defendant State of Oregon discriminated against Mr. Banks on the basis of his disability in violation of the Americans with Disabilities Act and Rehabilitation Act, causing him to suffer severe emotional distress and causing his eventual death during his incarceration at the Oregon Department of Corrections.

158.   Accordingly, Plaintiff, individually and as the personal representative of the estate of Jesse Banks, is entitled to economic and non-economic damages in an amount to be determined at trial against Defendant State of Oregon for the violations of 42 U.S.C. § 12101 et seq., § 504 of the Rehabilitation Act, and for plaintiff's attorney fees and costs pursuant to 29 USC § 794a(b) and 42 U.S.C. §§ 12205 and 1988.

//
//
//
//

**WAYNE A. LAMB LAW, LLC**
1915 S Church St.,
Dallas, OR 97338
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

### SECOND CLAIM FOR RELIEF

### (Civil Rights 42 USC § 1983 against D. Bernadette Huard, Ka Rin Johnson, Dr. Don Dravis, Arma Ybarra, Jessica Rausin, and Tabitha Drago)

159.    Plaintiff realleges paragraphs 1-158.

160.    Defendant Dr. Huard and Nurse Ka Rin Johnson were deliberately indifferent to Mr. Banks serious psychiatric needs as follows:

    a.  In failing to diagnose Mr. Banks' mental disorders and diseases, but rather issuing broad reviews of regurgitated material from prior medical notes; medical staff ignored his logical responses and statements about his allergic reactions to drugs and his fear in taking certains drugs due to previous physical reactions;

    b.  In failing to treat Mr. Banks' mental disorders and diseases;

    c.  In failing to read Mr. Banks' inmate file which indicated that he suffered from a developmental disability and had been previously treated and found competent to stand trial only months prior to the involuntary medication plan;

    d.  In failing to provide Mr. Banks with adequate mental health care;

    e.  In failing to properly assess Mr. Banks for suicidal or self-injury tendencies;

    f.  In failing to communicate those dangers, if known, to jail staff responsible for performing tier checks throughout the day on the BHU Tier.

    g.  In failing to follow ODOC's suicide prevention policy; and

    h.  In failing to follow up with Mr. Banks after issuing a drastic

WAYNE A. LAMB LAW, LLC
1915 S Church St.,
Dallas, OR 97338
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

psychotropic change that carried serious dangers of suicide, and that

would amount to an overdose in normal persons.

i.  In failing to provide a true and accurate police report surrounding the

circumstances of his death.

161.  Defendants Ka Rin Johnson, Jessica Rausin, and Arma Ybarra were all

deliberately indifferent to Mr. Bank's serious psychiatric needs:

a.  In practicing psychology without a license;

b.  In failing to read the inmate file that indicated that Mr. Banks suffered

from a developmental disability, had altered medications, and had a

substantial history with allergic reactions to certain prescription

medications that resulted in manic episodes and previous suicide

attempts;

c.  In failing to diagnose Mr. Banks' mental disorders and diseases;

d.  In failing to provide Mr. Banks with adequate mental health care;

e.  In failing to have a qualified mental health professional assess Mr.

Banks after he informed them that he had self-harmed in the past with

changed medications;

f.  In failing to treat Mr. Banks' mental disorders and diseases;

g.  In failing to properly assess Mr. Banks' for suicidal or self-injury

tendencies;

h.  In failing to follow ODOC's suicide prevention policy;

i.  In allowing Mr. Banks to remain in isolation in disciplinary segregation

under the guise of "Behavioral Health Unit," while he was still at risk for

**WAYNE A. LAMB LAW, LLC**
1915 S Church St.,
Dallas, OR 97338
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

suicide and without consistent observation or tier checks;

j.  In failing to provide any follow-up whatsoever after Mr. Banks made statements of self-harm;

k.  In failing to follow up with Mr. Banks after he displayed changing moods, which was noted as a concern over the preceding month that Mr. Banks had acted out of character; and

l.  In failing to make sure that Mr. Banks was moved to a higher visibility cell after switching his involuntary medication to a substantially stronger and substantially higher dose:

1.  **On 3/16/23:** his Invega medication was increased to 12 mg hs.
2.  **On 3/22/23:** his medication became an Injectable Invega Sustenna, receiving first dose of 234 mg IM on 3/22/23.
3.  **On 3/27/23:** he improperly received a dose of the 234 mg IM.
4.  **On 3/29/23,** he received a shot of 156 mg of the same drug.
5.  He was set to receive a "second dose" on 4/3/23, but the records show that he was given a second dose of 234 mg IM almost simultaneously, only a couple of days before his "second dose" of 156 mg IM. That amount grossly exceeded the standard prescription, which is to receive one 234 mg shot, and then received a monthly 156 mg IM dose.

m.  Along with Defendants Dr. Don Dravis, Dr. Huard by ignoring the prescription and failing to install important medical protocols for involuntary medication plans and causing an overdose when Mr. Banks received 234 mg IM, 234 mg IM, 156 mg IM, while taking his increased oral dose of 12 mg.

162.    As a result of Defendants Huard and Ka Rin Johnson's deliberate indifference, the Defendants violated Mr. Banks' right to be free from cruel and unusual punishment under the Eighth Amendment of the United States Constitution.

**WAYNE A. LAMB LAW, LLC**
1915 S Church St.,
Dallas, OR 97338
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

163.    As a result of Dr. Huard's and Ka Rin Johnson's violation of Mr. Banks'
Constitutional rights, Mr. Banks suffered the loss of life, and severe mental pain,
physical pain, and suffering leading up to his death. Accordingly, plaintiff Patricia
Nemeth, individually and as the personal representative of the Estate of Jesse Banks, is
entitled to economic and non-economic damages against Defendants Dr. Huard and Ka
Rin Johnson in an amount to be determined at trial for the violations of 42 U.S.C § 1983
and for plaintiff's attorney fees and costs pursuant to 42 U.S.C. § 1988.

### THIRD CLAIM FOR RELIEF

**(Civil Rights 42 USC § 1983 against all Defendants D. Bernadette Huard, Ka Rin
Johnson, Dr. Don Dravis, Arma Ybarra, Jessica Rausin, and Tabitha Drago)**

164.    Plaintiff realleges paragraphs 1-163.

165.    Defendants, Officer Michael Praska, Corporal Dustin Johnson, Lieutenant
Wright, Officer Holly Burghardt, Officer Travis A Banning, Officer N. Martin, Officer B.
Lohrman, Officer D. Smith, Officer J. McKinney, Officer K. Van Houten, and Corporal B.
Griffith were deliberately indifferent to a substantial risk of serious harm to plaintiff as
follows:

a.    By failing to conduct appropriate and thorough tier checks;

b.    By failing to conduct tier checks every 15 minutes as required by OAR
291-76-020 or even 30-minute increments as required by OAR 291-11-
30; and

c.    By failing to conduct cell searches as required by OAR 291-11-30.

166.    As a result of the deliberate indifference of Defendants, Officer Michael
Praska, Corporal Dustin Johnson, Lieutenant Wright, Officer Holly Burghardt, Officer
Travis A Banning, Officer N. Martin, Officer B. Lohrman, Officer D. Smith, Officer J.

**WAYNE A. LAMB LAW, LLC**
1915 S Church St.,
Dallas, OR 97338
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
L A W

McKinney, Officer K. Van Houten, and Corporal B. Griffith, the Defendants violated Mr.

Banks' right to be free from cruel and unusual punishment under the Eighth Amendment

of the United States Constitution.

167.    As a result of the deliberate indifference of Defendants, Officer Michael

Praska, Corporal Dustin Johnson, Lieutenant Wright, Officer Holly Burghardt, Officer

Travis A Banning, Officer N. Martin, Officer B. Lohrman, Officer D. Smith, Officer J.

McKinney, Officer K. Van Houten, and Corporal B. Griffith, their violation of Mr. Banks'

Constitutional rights, Mr. Banks suffered the loss of life, and severe mental pain,

physical pain, and suffering. Accordingly, plaintiff Patricia Nemeth, individually and as

the personal representative of the Estate of Jesse Banks, is entitled to economic and

non-economic damages against Defendants, Officer Michael Praska, Corporal Dustin

Johnson, Lieutenant Wright, Officer Holly Burghardt, Officer Travis A Banning, Officer

N. Martin, Officer B. Lohrman, Officer D. Smith, Officer J. McKinney, Officer K. Van

Houten, and Corporal B. Griffith in an amount to be determined at trial for the violations

of 42 U.S.C § 1983 and for plaintiff's attorney fees and costs pursuant to 42 U.S.C. §

1988.

### FOURTH CLAIM FOR RELIEF

**(Civil Rights 42 USC § 1983 Supervisor Liability against Defendant)**

168.    Plaintiff realleges paragraphs 1-167.

169.    As the Superintendent of OSP, Defendant Fhuere has the following

responsibilities:

        a.  To keep prisoners in safe custody under humane conditions;

        b.  Provide for public safety by managing the institution so as to maintain

**WAYNE A. LAMB LAW, LLC**
1915 S Church St.,
Dallas, OR 97338
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL LAW

control and custody of inmates;

   c.  To direct and/or coordinate all institution staff in providing counseling, psychological, and psychiatric services for inmates;

   d.  Supervise all institution personnel management practices, including hiring, disciplinary action, layoffs and termination;

   e.  Continuously monitor and keep informed of all applicable federal and state laws, Administrative Rules, and Regulations;

   f.  Ensure that legal rights of inmates are protected by maintaining knowledge of applicable law, and by developing and implementing institution policies in conformity with the law; and

   g.  Implement and monitor compliance with all ODOC/institution rules, policies and procedures.

170.  Defendant Fhuere was deliberately indifferent to Mr. Banks' health and safety as follows:

   a.  In failing to monitor and review the electronic logs indicating the frequency of tier checks in the BHU;

   b.  In failing to ensure that the correctional officers were performing thorough tier checks;

   c.  In failing to implement and/or monitor compliance with OAR 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 which requires that every inmate in disciplinary segregation status be checked at least once every 30 minutes;

   d.  In failing to implement and/or monitor compliance with OAR 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 which requires that every inmate with a suicide risk be checked

**WAYNE A. LAMB LAW, LLC**
1915 S Church St.,
Dallas, OR 97338
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

at least once every 15 minutes;

e.  In failing to implement and/or monitor compliance with OAR 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 which requires that each disciplinary segregated inmate be visited daily by a member of medical staff;

f.  In failing to implement and/or monitor compliance with OAR 291-76-020 which requires close observation after demonstration of suicide warning signs;

g.  In failing to implement and/or monitor compliance with OAR 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 which requires strict requirements to be met to Obtain Informed Consent for Administration of Psychotropic Medications;

h.  In allowing unqualified and unlicensed persons, including Ka Rin Johnson and Jessica Rausin and Arma Ybarra, to provide mental health services to high-risk inmates such as Mr. Banks;

i.  In allowing an environment where illegal drug administration, and poor drug administration procedures are used and is tolerated;

j.  In failing to monitor when forced medication injections are done, subjecting a person to multiple and unnecessary injections, including Mr. Banks;

k.  In failing to conduct internal investigations and training of inmate deaths to ascertain the prison's failures in preventing inmate deaths;

171.    Defendant Fhuere knew or should have known that his subordinates were not following or adhering to Oregon the Administrative Rules, and ODOC Policies and Procedures, and that such failure would result in a serious risk of injury or death to

**WAYNE A. LAMB LAW, LLC**
1915 S Church St.,
Dallas, OR 97338
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

inmates such as Mr. Banks.

172.    Defendant Fhuere knew or should have known that the medical personnel and staff were tasked to implement involuntary drug administration on persons with developmental disabilities in the BHU, and that failing to monitor such an operation would result in a serious risk of injury or death to inmates such as Mr. Banks.

173.    As a result of Defendant Fhuere's deliberate indifference, the OSP personnel violated Mr. Banks' right to be free from cruel and unusual punishment under the Eighth Amendment of the United States Constitution.

174.    As a result of Defendant Fhuere's violation of Mr. Bank's Constitutional rights, Mr. Banks suffered the loss of life, and severe mental pain, physical pain, and suffering. Accordingly, plaintiff Patricia Nemeth, individually and as the personal representative of the Estate of Jesse Banks, is entitled to economic and non-economic damages against Defendant Fhuere in an amount to be determined at trial for the violations of 42 U.S.C § 1983 and for plaintiff's attorney fees and costs pursuant to 42 U.S.C. § 1988.

## FIFTH CLAIM FOR RELIEF

### (Civil Rights 42 USC § 1983 Supervisor Liability against Defendants Dr. Don Dravis)

175.    Plaintiff realleges paragraphs 1-174.                                    .

176.    As the Chief of Psychiatry at ODOC and/or OSP, Defendant Dr. Don Dravis was responsible for ensuring his staff complied with Policy and Procedure as listed in paragraphs 145, 166, 171, 189, and 193.

177.    Defendant Dr. Don Dravis was deliberately indifferent to Mr. Banks' health and safety by failing to ensure his staff's compliance with Policy and Procedures and

WAYNE A. LAMB LAW, LLC
1915 S Church St.,
Dallas, OR 97338
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL LAW

OARs listed in claims I-IV.

178.    Defendant Dr. Don Dravis knew or should have known that his staff was not following or adhering to ODOC Policy and Procedures, and that such failure would result in a serious risk of injury or death to inmates such as Mr. Banks.

179.    Defendant Dr. Don Dravis knew or should have known that the health care workers were not tracking their involuntary medication doses appropriately on a single form for careful tracking, and that tolerating this conduct would result in a serious risk of injury or death to inmates such as Mr. Banks.

180.    As a result of Defendant Dr. Don Dravis's deliberate indifference, the OSP health care staff violated Mr. Banks's right to be free from cruel and unusual punishment under the Eighth Amendment of the United States Constitution.

181.    As a result of Defendant Dr. Don Dravis's violation of Mr. Banks' Constitutional rights, Mr. Banks suffered the loss of life, and severe mental pain, physical pain, and suffering. Accordingly, plaintiff Patricia Nemeth, individually and as the personal representative of the Estate of Jesse Banks, is entitled to economic and non-economic damages against Defendant Randall in an amount to be determined at trial for the violations of 42 U.S.C § 1983 and for plaintiff's attorney fees and costs pursuant to 42 U.S.C. § 1988.

## SIXTH CLAIM FOR RELIEF

**(14th Amendment – Due Process against Defendants D. Bernadette Huard, Ka Rin Johnson, Dr. Don Dravis, Dr. Richard Pardilla, Arma Ybarra, Jessica Rausin, and Tabitha Drago and supervisory liability of Corey Fhuere and D. Wilson)**

182.    Plaintiff, Trish Nemeth, incorporates and realleges paragraphs 1-181.

183.    "[T]he court must appoint guardian ad litem – or issue another appropriate

**WAYNE A. LAMB LAW, LLC**
1915 S Church St.,
Dallas, OR 97338
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

order – to protect a minor or incompetent person who is unrepresented in an action."

Fed. R. Civ. P. 17(c); See also *Harris v. Mangum*, 863 F.3d 1133, 1138 (9th Cir. 2017).

"The purpose of Rule 17(c) is to protect an incompetent person's interests in

prosecuting or defending a lawsuit." *Davis v. Walke*r, 745 F.3d 1303, 1310 (9th Cir.

2014). See also Harris, 863 F.3d at 1138.

184.    Where there is a substantial question regarding the mental competence of

a party proceeding pro se, the court should conduct a hearing to determine whether a

guardian or attorney should be appointed under Rule 17(c). See *Harris*, 863 F.3d at

1138; *Krain v. Smallwood*, 880 F.2d 1119, 1121 (9th Cir. 1989); see also *Allen v.

Calderon*, 408 F.3d 1150, 1153–54 (9th Cir. 2005) (holding that dismissal of inmate's

habeas petition for failure to prosecute without first conducting a competency hearing

was an abuse of discretion, and explaining that counsel could be appointed for limited

purpose of representing petitioner at competency hearing).

185.    Per written testimony from staff, the AIC declined to attend the hearing

and, as such, waived the right to be present at the hearing. (Oregon Dept. of

Corrections, Disciplinary Hearing, Finding of Fact, Conclusion, and Order, at pp 1).

186.    AIC Banks waived his right to attend the hearing. AIC Banks physically

attacked Officer Duarte by spitting at him.

187.    Mr. Banks was punished with a Loss of privileges from 12/20/22-1/16/23

and $50.00 fine. No guardian was provided.

188.    Sanctions merged per OAR 291-105-0066(8), signed by Hearing Officer

Joe E. Capps 12/20/22 and C. Fhuere 12/23/22

189.    The Misconduct Hearing Worksheet on page 3 states as follows:

**WAYNE A. LAMB LAW, LLC**
1915 S Church St.,
Dallas, OR 97338
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

    a.  "Jesse Banks had "Waived [his] right to attend and no statement provided."

    b.  "Procedural points: The AIC acknowledged at the hearing that they: 'Per Documentation.'"

    c.  Received: Misconduct Report ✓; Notice of Hearing/Rights ✓; Rules of Prohibited Conduct ✓.

    d.  Understand: Misconduct Report__; AICs Rights in a Hearing

    e.  Witnesses:_____.

    f.  Investigation:_____."

190.   This discipline hearing had nothing to do with medication. It was purely for the purpose of issuing punishment for spitting on an officer. OSP failed to comply with the rules for involuntary medication, as stated in claims I-V and as follows:

191.   The rules required as follows: an independent examining physician shall: review treatment record and discuss matter with inmate and witnesses. Dr. Richard Pardilla MD did not discuss the matter with the inmate. There is little information about the attempt to see Mr. Banks, just that "Inmate failed to appear for appointment." With his primary office in Roseburg, Oregon, it seems unlikely that Mr. Pardilla appeared in Salem at OSP at all. Even so, there is no note as to the actual attempts to speak with Mr. Banks or Witnesses.

192.   Richard Pardilla (MD) failed to discuss the matter with the inmate and witnesses as required by OAR 291-064-0110(b).

193.   Dr. Don Dravis, Dr. Huard, nor any other medical personnel or supervisory officer required any additional effort to ensure that Mr. Banks' interests were protected prior to involuntary medication.

194.   No Gaurdian ad litem was appointed to represent Mr. Banks.

195.   Due to the failure of the facility and its staff members, Jesse Banks was denied Due Process, and due to the failures of staff and supervisors, Jesse Banks was

**WAYNE A. LAMB LAW, LLC**
1915 S Church St.,
Dallas, OR 97338
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

deprived of life, liberty, and property.

196.    Accordingly, plaintiff Patricia Nemeth, individually and as the personal

representative of the Estate of Jesse Banks, is entitled to economic and non-economic

damages against Defendants, State of Oregon, ODOC, OSP, Corey Fhuere, D. Wilson,

Richard Pardilla, Dr. Huard, Dr. Don Dravis, Ka Rin Johnson, Arma Ybarra, Jessica

Rausin, K. Van Houten, Tabitha Drago, Officer Michael Praska, Corporal Dustin

Johnson, Lieutenant Wright, Officer Holly Burghardt, Officer Travis A Banning, Officer

N. Martin, Officer B. Lohrman, Officer D. Smith, Officer J. McKinney, Officer K. Van

Houten, and Corporal B. Griffithin an amount to be determined at trial for the violations

of 42 U.S.C § 1983 and for plaintiff's attorney fees and costs pursuant to 42 U.S.C. §

1988.

## SEVENTH CLAIM FOR RELIEF

**(1st Amendment; Freedom of Speech against Defendants D. Bernadette Huard, Ka Rin Johnson, Dr. Don Dravis, Dr. Richard Pardilla, Arma Ybarra, Jessica Rausin, and Tabitha Drago and supervisory liability of Corey Fhuere and D. Wilson)**

197.    Plaintiff realleges paragraphs 1-15, 23-52, 60-85, 147-197 and

incorporates them herein.

198.    Mr. Banks complained to staff regarding his medication and his allergic

and bad physical responses to the medications.

199.    He complained direction to Dr. Huard and Ka Rin Johnson, and the

medical departed ignored those complaints and requests.

200.    Defendants retaliated against his medically protected rights by ordering

involuntary medication.

201.    Defendants ignored Mr. Banks' right to be heard by allowing the

WAYNE A. LAMB LAW, LLC
1915 S Church St.,
Dallas, OR 97338
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

administrative process to go forward without the required interview of parties and witness required under Oregon's Administrative Rules.

202.    Oregon does not permit involuntary medication purely on the basis of the persons mental disorder, nor does the mental disorder circumvent the right to be heard on the issue of involuntary medication.

203.    ODOC, OSP, and its managing officers, including Mr. Fhuere, Mr. Wilson, Dr. Huard, and Ka-Rin Johnson, as well as the personnel who decided to involuntarily medicate without compliance with the OARs all ignored Mr. Banks' First Amendment rights.

204.    Instead of listening to Mr. Banks' complaints and medical concerns, the aforementioned directly and complicitly permitted involuntary medication of Jesse Banks, which was a retaliatory response to his desire and his legal right to stay off of their psychotropic medication directives.

205.    The involuntary medication order effectively silenced him and his right to speak on the subject of his mental health and medication needs.

206.    Accordingly, plaintiff Patricia Nemeth, individually and as the personal representative of the Estate of Jesse Banks, is entitled to economic and non-economic damages against Defendants, State of Oregon, ODOC, OSP, Corey Fhuere, D. Wilson, Richard Pardilla, Dr. Huard, Dr. Don Dravis, Ka Rin Johnson, Arma Ybarra, Jessica Rausin, K. Van Houten, Tabitha Drago, Officer Michael Praska, Corporal Dustin Johnson, Lieutenant Wright, Officer Holly Burghardt, Officer Travis A Banning, Officer N. Martin, Officer B. Lohrman, Officer D. Smith, Officer J. McKinney, Officer K. Van Houten, and Corporal B. Griffithin an amount to be determined at trial for the violations

**WAYNE A. LAMB LAW, LLC**
1915 S Church St.,
Dallas, OR 97338
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

of 42 U.S.C § 1983 and for plaintiff's attorney fees and costs pursuant to 42 U.S.C. §

1988.

### EIGHTH CLAIM FOR RELIEF

**(1st Amendment; Retaliation against Defendants D. Bernadette Huard, Ka Rin Johnson, Dr. Don Dravis, Dr. Richard Pardilla, Arma Ybarra, Jessica Rausin, and Tabitha Drago and supervisory liability of Corey Fhuere and D. Wilson)**

207.    Plaintiff realleges paragraphs 1-15, 23-52, 60-85, 147-197, and

incorporates them herein.

208.    As stated in Plaintiff's Seventh Claim for Relief, Plaintiff was denied his

right to advocate on his mental health needs. He had a right to be present for his

administrative proceedings and to communicate his needs to Dr. Pardilla. Dr. Pardilla

did not fulfill his duties, and clearly noted his failure in the form submitted to the

administrative committee.

209.    Mr. Banks was then retaliated against for his request to remain off of

psychotropic medication by prescription of medication by force without further

opportunities to be heard on his clearly communicated medication desires.

210.    Accordingly, plaintiff Patricia Nemeth, individually and as the personal

representative of the Estate of Jesse Banks, is entitled to economic and non-economic

damages against Defendants, State of Oregon, ODOC, OSP, Corey Fhuere, D. Wilson,

Richard Pardilla, Dr. Huard, Dr. Don Dravis, Ka Rin Johnson, Arma Ybarra, Jessica

Rausin, K. Van Houten, Tabitha Drago, Officer Michael Praska, Corporal Dustin

Johnson, Lieutenant Wright, Officer Holly Burghardt, Officer Travis A Banning, Officer

N. Martin, Officer B. Lohrman, Officer D. Smith, Officer J. McKinney, Officer K. Van

Houten, and Corporal B. Griffithin an amount to be determined at trial for the violations

**WAYNE A. LAMB LAW, LLC**
1915 S Church St.,
Dallas, OR 97338
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
L A W

of 42 U.S.C § 1983 and for plaintiff's attorney fees and costs pursuant to 42 U.S.C. § 1988.

**WHEREFORE**, plaintiff prays for relief as follows:

a. For judgment in favor of plaintiff, The Estate of Jesse Banks against Defendants for his economic and noneconomic damages in the amount of $20,000,000 or other reasonable amount to be proven at trial;

a. For judgment in favor of plaintiff, Trish Nemeth, against Defendants for her economic and noneconomic damage for a reasonable amount to be proven at trial;

b. For reasonable attorneys' fees and costs pursuant to 29 USC § 794a and 42 U.S.C. §§ 1988 and 12205; and

c. For such other and further relief as may appear just and appropriate.

DATED: this Sunday, August 18, 2024.

WAYNE A LAMB – LAW

By:____/s/ Wayne Lamb____
    Wayne Lamb, OSB#211908
    wayne@wlamblaw.com
    Of Attorneys for Plaintiff

**WAYNE A. LAMB LAW, LLC**
1915 S Church St.,
Dallas, OR 97338
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW