# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **PATRICIA "TRISH" NEMETH**, individually and as the Personal Representative of the **ESTATE OF JESSE BANKS**,<br><br>Plaintiff,<br><br>v.<br><br>**OREGON DEPARTMENT OF CORRECTIONS**, **OREGON STATE PENITENTIARY**, **COREY FHUERE**, **RICHARD PARDILLA**, **KA RIN JOHNSON**, **BERNADETTE LOUISE HUARD**, **DON DRAVIS**, **JESSICA RAUSIN**, **MICHAEL PRASKA**, **DUSTIN JOHNSON**, **HOLLY BURGHARDT**, **PAUL WRIGHT**, **JACOB MCKINNEY**, **ALEX WAGNER**, and **REBECCA MILLIUS**,<br><br>Defendants. | Case No. 6:24-cv-1355-SI<br><br>**OPINION AND ORDER** |

Wayne A. Lamb, WAYNE A. LAMB LAW, 183B High Street NE, Salem, OR 97301. Of Attorneys for Plaintiff.

Dan Rayfield, Attorney General, Rebecca D. Maile, Senior Assistant Attorney General, and Nathaniel Aggrey, Senior Assistant Attorney General, OREGON DEPARTMENT OF JUSTICE, 1162 Court Street NE, Salem, OR 97301. Of Attorneys for the State Defendants.

Karen M. O'Kasey, Zachariah H. Allen, and Jason V. Cohen, HART WAGNER LLP, 1000 SW Broadway, Suite 2000, Portland, OR 97205. Of Attorneys for Defendant Dr. Richard Pardilla.

Ramon Henderson, HODGKINSON STREET MEPHAM LLC, 1620 SW Taylor Street, Suite 350, Portland, OR 97205. Of Attorneys for Defendant Dr. Bernadette Louise Huard.

PAGE 1 – OPINION AND ORDER

**Michael H. Simon, District Judge.**

Plaintiff Patricia Nemeth is the mother of decedent Jesse Banks ("Banks") and the personal representative of his estate. Banks was an inmate at the Oregon State Penitentiary ("OSP") at the time of his death. Plaintiff sues the OSP Superintendent Cody Fhuere; Ka Rin Johnson ("Johnson"), LCSW, QMHP; Dr. Don Dravis; Jessica Rausin; MS, QMHP; Officer Michael Praska; Corporal Dustin Johnson ("Corporal Johnson"); Officer Holly Burghardt; Lieutenant Paul Wright; Officer J. McKinney; Officer Alex Wagner; Dr. Rebecca Millius (collectively "Individual State Defendants"), the Oregon Department of Corrections ("ODOC"); and OSP (all collectively, "State Defendants.")[1] Plaintiff also sues two medical providers outside the prison system, Richard Pardilla, M.D., and Bernadette Louise Huard, M.D. Plaintiff sues the individuals in their personal capacities, except Superintendent Fhuere and Dr. Millius, who are sued in their official, supervisory, and personal capacities.

Plaintiff asserts eight claims for relief. Plaintiff brings one claim alleging violations of the Americans with Disabilities Act ("ADA") and § 504 of the Rehabilitation Act, and seven claims under 42 U.S.C. § 1983, alleging violations of Banks' constitutional rights, all asserted against various Defendants. Plaintiff alleges that: (1) the institution and a supervisor failed to accommodate Banks' mental disabilities; (2) medical providers did not provide Banks with adequate psychiatric treatment and care for those disabilities, in violation of the Eighth Amendment; (3) individuals failed to protect Banks despite knowing about his vulnerable mental state, in violation of the Eighth Amendment; (4) supervisors failed to protect Banks, in violation of the Eighth Amendment; (5) the chief of psychiatry did not ensure Banks received adequate

---

[1] Plaintiff also names in the SAC as Defendants Officer Travis Banning, Officer Nick Martin, Kameron Van Houten, and Officer Danny Smith, but Plaintiff has stipulated to their dismissal. ECF 31 at 23.

psychiatric care, in violation of the Eighth Amendment; (6) Defendants placed Banks on involuntary medication without providing due process, in violation of the Fourteenth Amendment; (7) medical and supervisory personnel retaliated against Banks for speaking out about side effects of medication, in violation of the First Amendment; and (8) medical and supervisory personnel retaliated against Banks for resisting involuntary medication. Banks also alleges that the Medical Examiner's report was missing crucial facts that may have changed the conclusion as to the cause of Banks' death.[2]

The Individual State Defendants move to dismiss all claims against them.[3] The remaining two individual defendants, Drs. Pardilla and Huard, each bring separate motions to dismiss. All three motions argue that Plaintiff fails to state a claim on which relief may be granted. For the reasons stated below, the Court grants in part and denies in part the Individual State Defendants' motion and Dr. Huard's motion, and grants Dr. Pardilla's motion.[4]

## STANDARDS

A motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). In evaluating the sufficiency of a complaint's factual

---

[2] Before any defendant responded to the original complaint, Plaintiff filed a first amended complaint. Before any defendant responded to that complaint, Plaintiff moved to file a Second Amended Complaint ("SAC"), which the Court granted. The SAC is the operative complaint.

[3] The Oregon Department of Justice, which represents all State Defendants, does not move to dismiss the claims against ODOC or OSP, either on grounds of Eleventh Amendment immunity or failure to state a claim. Nor, however, has counsel for the State Defendants filed an answer on behalf of ODOC or OSP. Plaintiffs, on the other hand, have not moved for entry of default against ODOC or OSP.

[4] Notwithstanding the parties' request for oral argument, the Court does not believe that oral argument would help resolve the pending motion. *See* LR 7-1(d)(1).

allegations, a court must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most favorable to the non-moving party. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). To be entitled to a presumption of truth, allegations in a complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). The Court must draw all reasonable inferences from the factual allegations in favor of the plaintiff. *Newcal Indus. v. Ikon Off. Sol.*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008). The Court need not, however, credit a plaintiff's legal conclusions that are couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

A complaint must contain sufficient factual allegations to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr*, 652 F.3d at 1216. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Mashiri v. Epsten Grinnell & Howell*, 845 F.3d 984, 988 (9th Cir. 2017) (quotation marks omitted).

## BACKGROUND[5]

### A.  Early Time at OSP

In 2018, Banks entered OSP and was housed in the behavioral health unit ("BHU") as an individual with a developmental disorder. SAC ¶ 38. He originally had been found unfit to stand trial but was then restored to a level of competency sufficient for his proceedings in Washington County Circuit Court, where he was convicted and sentenced to 38 months' imprisonment. *Id.* ¶ 28.

In 2022, Banks was convicted and sentenced in Marion County Circuit Court to three years in ODOC. *Id.* ¶¶ 30-31. Like in 2018, Banks was originally found unfit to stand trial but was then restored to a sufficient level of competency. *Id.* ¶ 30. Banks had 11 criminal proceedings after 2006, and in every felony case the court or his attorney raised competency concerns. *Id.* ¶¶ 27, 32.

Plaintiff alleges that due to Banks' history at OSP and specifically in the BHU, Defendants had knowledge of Banks' mental health conditions—schizophrenia, depression, and anxiety. *Id.* ¶ 173. Plaintiff also alleges that OSP knew that Banks' previously had attempted suicide. *Id.* ¶¶ 78, 79, 171.

### B.  Housing at OSP

Plaintiff alleges that Banks was housed in the BHU when he was placed in OSP in 2022. *Id.* ¶ 25. He was housed in BHU, tier two, cell 34. *See id.* ¶ 31. Plaintiff repeatedly alleges that Banks was housed in that cell when he died. *See, e.g.*, *id.* ¶¶ 31, 103, 111, 115, 118, 128, 142, 144. Plaintiff also alleges that Banks was in "solitary confinement" in the hours before his death.

---

[5] The Court recites the background from the allegations in the SAC, but notes that many of the allegations are unclear, confusing, or contradictory, and some of the unclear facts are important to Plaintiff's claims. The Court notes where more clarity would be beneficial in any Third Amended Complaint.

*Id.* ¶ 98. Plaintiff further alleges that Banks was "in disciplinary segregation under the guise of 'Behavioral Health Unit.'" *Id.* ¶ 184(i).

On December 13, 2022, Banks spit at a correctional officer from his BHU cell 34. *Id.* ¶¶ 67, 71. The officer filed a complaint, and because of that complaint Banks was "placed into segregation" and "stripped of many necessities and basic luxuries provided to other [adults in custody]." *Id.* ¶¶ 72-73. Plaintiff also, however, alleges that simply being housed in the BHU meant that Banks "was denied virtually all programs, services, and activities available to the prisoners, e.g., exercise, yard time, games, television, socialization, job programs, educational opportunities, etc." *Id.* ¶ 176(d).

Plaintiff's allegation that Banks was placed into disciplinary segregation as punishment for spitting on an officer supports that he was not in segregation before that conduct. Banks, however, was housed in BHU cell 34 at the time he spit on the officer. Plaintiff's allegations are not clear whether placing Banks into segregation meant leaving him in his existing BHU cell but reducing his privileges, or moving him to another area of the prison for solitary confinement. Nor is it clear that Banks, having been put into disciplinary segregation in December 2022, was still in disciplinary segregation four months later, at the time of his death in April 2023. And losing privileges as a result of disciplinary segregation is contradictory to Plaintiff's allegations that simply being housed in the BHU means not having any privileges. The status of Banks' housing and privileges must be made clearer in any Third Amended Complaint.

## C. Involuntary Medication

The December 13th spitting incident allegedly "triggered steps within the facility to place [Banks] on involuntary medication." *Id.* ¶ 73. Plaintiff alleges that Dr. Huard "advised involuntary medication" and that Dr. Dravis "effectively stamped the same as head of the Department." *Id.* ¶¶ 188-89. Dr. Huard issued an involuntary medication form on December 21,

2022.[6] *Id.* ¶ 65. Rausin signed the "declined to sign" notation on that form. *Id.* Rausin also initialed the "no appeal" section on the Administration of Involuntary Medications Appeal Process Review form. *Id.*

Plaintiff alleges that Dr. Pardilla, a licensed physiatrist who was brought in as an independent physician by ODOC, failed to afford Banks his Fourteenth Amendment due process rights by not complying with Oregon Administrative Rules ("OAR") by failing to interview Banks and other witnesses. *Id.* ¶¶ 252-53, 255. Plaintiff further alleges that because of these failures by Dr. Pardilla to follow Oregon regulations, "Defendants ignored Mr. Banks's right to be heard," *id.* ¶ 273, specifically on "his right to speak on the subject of his mental health and medication needs." *id.* ¶ 277.

In the SAC, however, Plaintiff states that Banks "reject[ed] Dr. Pardilla's review" and "declined to attend the hearing, and, as such, waived the right to be present at the hearing." *Id.* ¶¶ 195, 244. This appears to allege that Plaintiff *waived* his right to attend his medication review hearing, not that Defendants failed to provide a hearing under Oregon regulations or constitutionally required due process. Later, Plaintiff references a "Misconduct Hearing Worksheet," which notes that Banks waived his right to attend the misconduct hearing and that it "had nothing to do with medication." *Id.* ¶¶ 250-51. Whether Plaintiff waived both a "misconduct" hearing and a hearing related to "Dr. Pardilla's review" is unclear in the SAC and must be clarified.

Plaintiff tries to clarify some of these inconsistencies in his response to the motion to dismiss, stating that Banks waived his right to attend the involuntary medication hearing but was

---

[6] The SAC alleges that this form was issued December 21, 2024, which appears to be scrivener's error, because that is 20 months after Banks' death. The Court construes this date as December 21, 2022.

not given adequate information about his rights or notice of the hearing. ECF 29 at 8. But statements in a brief are outside the pleadings and inappropriate to satisfy a pleading deficiency. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018) ("Generally, district courts may not consider material outside the pleadings when assessing the sufficiency of a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure.").[7] A future amended complaint should clarify what hearings Banks attended, refused to attend, or was not provided enough information or otherwise allegedly could not make an informed decision about attending.

Banks at some point did speak up about his desire to stay off psychotropic medication. Plaintiff alleges that "the facility retaliated with involuntary medication and solitary confinement" and deprived Banks of "rights and necessities afforded to other inmates." SAC ¶ 288. Defendant officers also allegedly deprived Banks of a number of privileges after he spoke up about his desire to stay off medication. *Id.* ¶ 292. This is a third reason alleged for why Banks lost privileges.

**D. Banks' Death**

On April 1, 2023, Officer Praska noticed that Banks was unresponsive in his BHU cell 34 at approximately 9:45 AM, and obtained assistance from Corporal Johnson. *Id.* ¶¶ 25, 111, 114. Additional officers responded and then medical staff responded, until paramedics arrived. *Id.* ¶¶ 118, 128, 137. Banks was pronounced dead at 10:07 AM. *Id.* ¶ 141.

Guards who walk the tier must fill out a BHU tier patrol log. *Id.* ¶ 95. The facility must comply with regulations requiring certain tier check frequencies, including every 30 minutes for inmates in disciplinary segregation and every 15 minutes for inmates with a risk of suicide. *Id.*

---

[7] Additionally, even if this motion were a motion for summary judgment and the Court could consider evidence outside the pleadings, statements in a brief are not evidence. *See Schultz v. Wells Fargo Bank, Nat. Ass'n*, 970 F. Supp. 2d 1039, 1066 (D. Or. 2013) ("[T]he Court does not consider factual statements in briefs as record evidence.").

¶ 224(c), (d). Plaintiff's allegations regarding the tier checks for the hours leading up to Banks'

death are inconsistent. Plaintiff alleges that Officers Wagner and Smith and Corporal Johnson

"checked the tier approximately every 36 minutes from midnight, until Jesse Banks' death." *Id.*

¶ 96. Plaintiff also alleges, however, that Officers Wagner and Smith and Corporal Johnson

"allowed one 90-minute interval to pass and an interval of 174 minutes without a tier check on

the behavioral health unit, during the hours leading up to the death. Those occurred while

Mr. Banks was in solitary confinement and while he was a high suicide risk . . . ." *Id.* ¶ 98.

Although these paragraphs are less than clear as to whether the 90- and 174-minute gaps applied

specifically to the tier checks on Banks (because, as previously discussed, Plaintiff's allegations

regarding housing in the BHU versus solitary confinement are unclear), in Plaintiff's

introductory, unenumerated explanation in the SAC, Plaintiff describes how Officer Wagner and

Corporal Johnson left Banks unmonitored for those two large gaps in time. *See* SAC at 4.

Banks was found on his bunk, almost completely covered by his blanket. *Id.* ¶¶ 50, 55.

There allegedly is inconsistent information regarding his position. Photographs and officer

reports allegedly provide conflicting answers as to whether he was prone with his hands under

his torso or whether one hand was stretched out. *Id.* ¶¶ 55, 57.

The autopsy report prepared by Dr. Millius states that Banks was found strangled, which

she reports as self-inflicted, and notes that his hands were under his torso. *Id.* ¶¶ 57-58. This

report, however, omits the presence of a N-95 mask lodged in Banks' throat. Plaintiff states that

a detective on the scene observed "Dr. Millius pulled an N-95 mask from Jesse Banks' throat,"

but the detective also noted "it is unclear whether the medical examiner ever saw this mask." *Id.*

¶¶ 54, 58. The autopsy report also showed that Banks was given an additional dose of

paliperidone, the psychotropic drug he was involuntarily prescribed, on the night of his death, as there were two undissolved pills in his stomach. *Id.* ¶ 101.

### E.  Alleged Failures by OSP

Plaintiff alleges that Banks' medical care providers within ODOC failed to diagnose, treat, and properly assess Banks' medical conditions. *Id.* ¶¶ 182, 184. Plaintiff also contends that during Banks' time at OSP, he was "repeatedly picked on for his mental disorder." *Id.* ¶ 176(l).

Tier checks by prison officials were important to protect Banks due to his mental disorders, and particularly his suicidal ideation. *Id.* ¶¶ 82, 84, 96-97, 184(i). Plaintiff alleges that medical personnel and Superintendent Fhuere failed to inform the officers of the serious need for routine tier checks for Banks, *id.* ¶ 207, and that the officers failed to perform appropriate tier checks as required by regulations and policy on the day Banks died, *id.* ¶ 218. Superintendent Fhuere allegedly failed to train personnel and implement policies in compliance with various Oregon regulations, *id.* ¶¶ 152, 224, and Dr. Dravis did not adequately ensure his staff, the health care workers, complied with policy, *id.* ¶ 237. Plaintiff also contends that Dr. Millius produced a dishonest report of Banks' death because it omitted the N95 mask and misrepresented Banks' body position. *Id.* ¶ 58, 228.

### DISCUSSION

### A.  Individual State Defendants

#### 1.  Disability Accommodation (Claim 1)

Claim One is brought under the ADA and § 504 of the Rehabilitation Act. Claims under these two statutes are analyzed together because the language of the statutes is substantially the same and there is no difference in the analysis of rights and obligations under the acts. *See Zukle v. Regents of Univ. of Cal.*, 166 F.3d 1041, 1045 n.11 (9th Cir. 1999). As against the Individual

State Defendants, Claim One is brought against Dr. Dravis, Johnson, Rausin, and Superintendent

Fhuere.

      Plaintiff sues the Individual State Defendants in their individual capacity. This is not

permissible under Title II or the Rehabilitation Act. *See Walsh v. Nev. Dept. of Hum. Res.*, 471

F.3d 1033, 1038 (9th Cir. 2006) (holding that "individual defendants cannot be held personally

liable for violations of the ADA"); *Mendoza Garcia v. Cal. Dep't of Corr. & Rehab.*, 2025 WL

2521101, at *12 (E.D. Cal. Sep. 2, 2025) ("Plaintiffs cannot state a claim under the ADA or the

[Rehabilitation Act] against any defendant in their individual capacities.").

      Superintendent Fhuere, however, also is sued in his official capacity. "Although

individual defendants may not be sued in their individual capacities under Title II of the ADA,

they may be sued in their official capacities because suing an individual in his official capacity is

treated the same as suing the entity itself." *Becker v. Or.*, 170 F. Supp. 2d 1061, 1066 (D. Or.

2001); *see also Mendoza Garcia*, 2025 WL 2521101, at *12 ("To state a claim under the ADA or

[Rehabilitation Act], a plaintiff must bring a lawsuit against a public entity or against a person in

their official capacity."). Therefore, the following discussion only concerns Superintendent

Fhuere because, as noted, Defendants ODOC and OSP have not moved to dismiss or otherwise

responded.

      To state a claim under Title II of the ADA, plaintiff must show:

> (1) he is a qualified individual with a disability; (2) he was either
> excluded from participation in or denied the benefits of a public
> entity's services, programs, or activities, or was otherwise
> discriminated against by the public entity; and (3) this exclusion,
> denial, or discrimination was by reason of his disability.

*Cohen v. City of Culver City*, 754 F.3d 690, 695 (9th Cir. 2014); *see also Pa. Dep't of Corr. v.*

*Yeskey*, 524 U.S. 206, 213 (1998) (holding that Title II of the ADA extends to state prisoners).

No party disputes that Banks has a disability as defined by 42 U.S.C. § 12102, and also is a

PAGE 11 – OPINION AND ORDER

qualified individual under the statute. Plaintiff also sufficiently alleges that Superintendent Fhuere knew that Banks suffered from a developmental mental health disorder. SAC ¶ 173.

The Individual State Defendants argue that Plaintiff alleges inadequate treatment for Banks' mental health rather than discrimination because of a disability. This relates to Plaintiff's allegations that Banks was given involuntary medication, and the Court agrees that this does not support Plaintiff's ADA claim.

Plaintiff also argues that her allegations that Banks was deprived of sheets, blankets, and towels due to his disability support the Title II claim. Plaintiff, however, alleges that Banks tied his cell door shut with a blanket so that correctional staff could not open the cell door. A correctional officer had to use tear gas to get Banks out of his cell. After that incident, ODOC deprived Banks of blankets, sheets, and towels. Plaintiff does not plausibly allege that this deprivation was because of Banks' disability.

Plaintiff further contends that her allegations that ODOC denied Banks access to programs such as exercise, yard time, games, television, socialization, job programs, and educational opportunities support Plaintiff's ADA claim. Plaintiff's allegations in her ADA claim are that this deprivation was because Plaintiff was housed in the BHU. SAC ¶ 176(d). A reasonable inference from Plaintiff's allegations is that Banks was housed in the BHU due to his mental disabilities. Elsewhere, however, Plaintiff alleges that Banks was deprived of privileges because he was placed in disciplinary segregation.[8] *Id.* ¶ 73. And later, Plaintiff alleges he lost these privileges in retaliation for speaking out about his medication. *Id.* ¶ 289. Plaintiff's

---

[8] Without further facts, the Court finds it implausible that simply being housed in the BHU means an inmate has no privileges. *See* Disability Rights Oregon, *Final Report* (Winter 2021) (describing conditions in the BHU after four years under a Memorandum of Understanding, where most inmates have televisions in their cells and spend on average more than 20 hours per week out of their cells). Plaintiff's allegations that Banks lost privileges from disciplinary segregation, however, are plausible.

inconsistent and confusing allegations regarding when, how, and why Banks lost his privileges fail to provide the necessary support plausibly to allege Plaintiff's ADA claim.[9]

### 2. Section 1983 Claims (Claims 2-8)[10]

#### a. Official and Supervisory Capacity

Plaintiff sues Superintendent Fhuere and Dr. Millius in their official, supervisory, and individual capacities. Plaintiff's official capacity claims under § 1983 do not stand, as state officials sued in their official capacity for damages are not persons under § 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64, 71 (1989); *see Jackson v. Carey*, 353 F.3d 750, 758 (9th Cir. 2003) (affirming dismissal of claims against prison officials in their official capacities because they are not persons within the meaning of § 1983).

Under a theory of supervisor liability, "[a] supervisor is only liable for the constitutional violations of . . . subordinates if the supervisor participated in or directed the violations, or… failed to act to prevent them." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). "[S]upervisors can be held liable for: 1) their own culpable action or inaction in the training, supervision, or control of subordinates; 2) their acquiescence in the constitutional deprivation of which a

---

[9] Plaintiff does not appear to be alleging alternative theories for how Banks lost his privileges and does not allege that Banks lost privileges, regained them, and then lost them for a new reason. Indeed, that theory would not comport with Plaintiff's allegation that simply being housed in the BHU meant that Banks had no privileges.

[10] Plaintiff identifies claims 2-5 as under 42 U.S.C. § 1983 and 6-8 as under the First and Fourteenth Amendments to the U.S. Constitution. Section 1983, however, is the statute by which a plaintiff may bring claims for violations of federal statutes and the U.S. Constitution against state actors. It is not its own independent cause of action. *See Crowley v. Nev. ex rel. Nev. Sec'y of State*, 678 F.3d 730, 734 (9th Cir. 2012) ("[Section] 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights where elsewhere conferred." (citing *Graham v. Connor*, 490 U.S. 386, 393-94 (1989))). Thus, the Cout construes Claims 2-5 as claims under § 1983 asserting violations of the Eighth Amendment and Claims 6-8 as under § 1983 asserting violations of the First and Fourteenth Amendments.

complaint is made; or 3) for conduct that showed a reckless or callous indifference to the rights of others." *Hyde v. City of Willcox*, 23 F.4th 863, 874 (9th Cir. 2022) (quotations omitted).

Regarding Dr. Millius, Plaintiff does not allege any facts of her acting in a supervisory capacity. Thus, Plaintiff fails to state a claim against Dr. Millius in her supervisory capacity.

Regarding Superintendent Fhuere, Plaintiff asserts in Claim Four that Superintendent Fhuere is liable in his supervisory capacity for failing to train employees and failing to implement proper policies and procedures. The Court finds that the allegations in the other § 1983 claims against Superintendent Fhuere, if intended to be directed to his supervisory capacity, either do not state a claim or are duplicative of the allegations in Claim Four. The Court next evaluates the sufficiency of the allegations in Claim Four.

### i.  Failure to train

To prevail on a claim of supervisory liability for failure to train, the plaintiff must sufficiently allege that the official "was deliberately indifferent to the need to train subordinates, and the lack of training actually caused the constitutional harm or deprivation of rights." *Flores v. County of Los Angeles*, 758 F.3d 1154, 1159 (9th Cir. 2014). "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (quoting *Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 409 (1997)); *see also Flores*, 758 F.3d at 1159. Absent a pattern of similar violations, failure to train "may amount to a policy of deliberate indifference if the need to train was obvious and the failure to do so made a violation of constitutional rights likely." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (quotation marks omitted); *see also Flores*, 758 F.3d at 1159-1160 (explaining that failure to train claims may be shown without a pattern of conduct in rare circumstances where "the unconstitutional consequences of failing to train . . . are so patently obvious").

Plaintiff alleges that Superintendent Fhuere was required to train staff on proper cell searches and cell monitoring as required by the OARs. SAC ¶ 152(i), (j). Under OAR 291-076-0020 Banks would need monitoring every 15 minutes if he had moderate suicide risk, and under OAR 291-11-030(5) every 30 minutes if he was in disciplinary segregation.

A gap in monitoring of 90 and 174 minutes would violate both OARs and create a patently obvious danger to vulnerable inmates in the BHU. *Cf. Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1077-78 (9th Cir. 2013) (denying summary judgment on failure to protect claim based on supervisory defendants allowing mentally ill inmates to remain unchecked for three and a half hours). Plaintiff, however, must allege that the lack of training actually caused Banks' alleged harm. *See Flores*, 758 F.3d at 1159. This means that Plaintiff must plead that Banks was subject to the 30 or 15 minute cell checks. Plaintiff, however, does not clearly allege that Banks was in disciplinary segregation at the time of his death. Thus, Plaintiff's claim under the OARs hinges on whether Plaintiff plausibly alleges that Defendants should have checked Banks' cell every 15 minutes.[11]

Plaintiff alleges that Johnson and Rausin reported Banks' previous suicide attempts and noted his reports of suicidal ideation. *Id.* ¶¶ 170-71. Banks had been placed on close suicide watch "many times." *Id.* ¶ 172. Banks displayed mood changes in the month before his death and made statements of self-harm. *Id.* ¶ 184(j), (k). Plaintiff also alleges, however, that Dr. Huard's notes "repeatedly" indicated that Banks was not suicidal, including the day before his death. *Id.* ¶ 60. But Plaintiff alleges that Dr. Huard "knew, over several years of treating Mr. Banks, that Jesse Banks' had a habit of hiding his suicidal history and tendencies." *Id.* ¶ 79. Plaintiff also alleges that Banks reported that medication changes caused his mental health to decline, and that

---

[11] Plaintiff does not allege that under the OARs or OSP policy there is a required tier check frequency for regular BHU inmates, who are not suicidal or in disciplinary segregation.

Defendants significantly changed Banks' medication shortly before his death. *Id.* ¶¶ 78, 184(l). Defendants also gave Banks an extra dose of medication the night he died. *Id.* ¶¶ 100-01.

Even viewing these facts in the light most favorable to Plaintiff, she has not alleged facts supporting that Defendants should have known that Banks was suicidal, necessitating 15-minute checks. Plaintiff's allegations show that Banks had a history of mental illness and previous suicide attempts and suicidal ideation, along with some emotional disturbances in the months before his death. Accepting Plaintiff's theory, however, would require suicide watch for all mentally ill inmates with a history of suicidal ideation and previous suicide attempts who suffer any current symptoms. Plaintiff's argument paints too broadly. Prison officials need something more than a history to conclude that an inmate *currently* is *suicidal*. *See, e.g.*, *Simmons v. Navajo County, Ariz.*, 609 F.3d 1011, 1018-19 (9th Cir. 2010) (rejecting argument that jail medical provider was deliberately indifferent to suicide risk of inmate who had attempted suicide one month prior and was suffering from depression), *overruled in part on other grounds by Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (en banc); *Conn v. City of Reno*, 591 F.3d 1081, 1095 (9th Cir. 2010) (relying, among other things, on a history of mental health problems and suicide threats and attempts along with *suicidal ideation* three days before the inmate committed suicide to deny summary judgment).

Plaintiff also alleges, however, that Superintendent Fhuere was required to train staff generally on "appropriate and thorough tier checks to ensure inmate safety." SAC ¶ 152(h). This allegation goes along with the allegation under the OAR on how properly to check a cell. Plaintiff does not allege a pattern of similar unconstitutional conduct. Monitoring mentally ill inmates, however, is one of the rare circumstances where the need to train is patently obvious and the unconstitutional consequences of a failure to train are likely. It can easily be expected

that high risk inmates may die or suffer serious bodily injury when under the care of correctional officers who are untrained in monitoring or conducting proper cell checks. *Cf. Lemire*, 726 F.3d at 1076-77 (reversing summary judgment in failure to protect claim relating to an inmate's apparent suicide and discussing evidence that "inmates should not be left without supervision for extended periods of time," including that the danger was "exacerbated" because most of the unmonitored inmates were mentally ill and a reasonable "jury could infer that unsupervised mentally ill inmates housed together are more likely to harm themselves"). Banks' cell was allegedly unmonitored once for 90 and once for 174 minutes. Although the SAC is somewhat confusing as to when Banks' cell was unmonitored for these periods, which may ultimately be important for causation, that is not an issue to address in this context. Accepting Plaintiff's allegations as true and construing them in the light most favorable to Plaintiff, she adequately alleges a claim for failure properly to train on monitoring and cell searches.

### ii. Failure to implement policies

Regarding failing to implement sufficient policies, supervisory personnel who implement a policy so deficient that the policy itself is a repudiation of constitutional rights and the moving force behind a constitutional violation may be liable even where such personnel do not overtly participate in the offensive act. *See Redman v. County of San Diego*, 942 F.2d 1435, 1446 (9th Cir. 1991) (en banc). Plaintiff alleges that Superintendent Fhuere was responsible for, and failed properly to, implement various policies and procedures as required under the OARs and ODOC requirements, particularly with respect to conducting timely tier checks. *See, e.g.*, SAC ¶¶ 150-52, 216, 223-24. Viewing the facts in the light most favorable to Plaintiff, these allegations are sufficient at this stage of the litigation to state a claim for failure to implement sufficient policies. *See Reed v. Nelson*, 2021 WL 2417655, at *4 (E.D. Cal. June 14, 2021) ("Plaintiff has alleged that Warden Hill failed to implement policies providing appropriate ADA accommodations . . . .

PAGE 17 – OPINION AND ORDER

Plaintiff asserts that because Hill accepted an ADA inmate into his facility, he should have been aware of a need to train his officers accordingly yet failed to do so. Construing the complaint liberally, Plaintiff has made a valid allegation of supervisor liability on the theory that the Warden's failure to enact a policy regarding ADA inmates amounts to a deficient policy.").

Plaintiff also alleges that Superintendent Fhuere knew or should have known that his subordinates were not following these requirements and that this failure was likely to cause death or serious injury to inmates. *See* SAC ¶ 225. This is enough to allege the necessary causal connection, particularly considering the other allegations in the SAC. Thus, Plaintiff adequately states a claim against Superintendent Fhuere in his supervisory capacity for Plaintiff's Fourth Claim for Relief.

### b.  Personal Capacity

Although a plaintiff may not sue state officials in their official capacity for money damages in a § 1983 action, state officers are subject to § 1983 liability for damages in their personal capacities, even when their conduct relates to their official duties. *Hafer v. Melo*, 502 U.S. 21, 25 (1991). "Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). To establish personal liability in a § 1983 action a plaintiff must show that "the official, acting under color of state law, caused the deprivation of a federal right." *Id.* at 166; *see also Est. of Prasad ex rel. Prasad v. County of Sutter*, 958 F. Supp. 2d 1101, 1110 (E.D. Cal. 2013) (explaining that a plaintiff must plead individual allegations against each defendant that demonstrate individual constitutional violations).

### i.  Eighth Amendment Claims

Claim Two alleges an Eighth Amendment claim for constitutionally deficient medical treatment. To state this claim, Plaintiff must allege "deliberate indifference to serious medical

needs." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). A plaintiff can "show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Id.* (quotation marks omitted). Deliberate indifference is a "state of mind more blameworthy than negligence" and requires "more than ordinary lack of due care for the prisoner's interests or safety." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). "[I]nadvertent or negligent failure to provide adequate medical care alone does not state a claim under § 1983." *Jett*, 439 F.3d at 1096 (cleaned up).

Plaintiff generally alleges that medical care providers Johnson and Rausin failed properly to diagnose and treat Banks' mental disorders and Dr. Dravis did not properly oversee the medical providers. These broad allegations fail to support an Eighth Amendment claim, particularly because Dr. Dravis is not sued in his supervisory capacity. Plaintiff also specifically alleges, however, that Johnson and Rausin failed properly to consider Banks' medical file regarding his developmental disorder and mental competency issues, failed properly to evaluate Banks' suicide risk and follow ODOC's suicide prevention policy, failed to consider the effects of placing Banks on involuntary medication, failed properly to respond to Banks' noted mood changes, failed properly to respond to Banks' statements of self-harm, and failed to follow up with Banks after making a drastic change to his medication knowing that medication changes caused his mental health to decline. These allegations are in the context of the other allegations in the SAC, including Banks' history with and conduct known by these Defendants.

"A heightened suicide risk or an attempted suicide is a serious medical need." *Conn*, 591 F.3d at 1095. Further, "[i]t is well-established that prison officials must provide care in response

to mental health needs as they would any other medical need." *de Tagle v. Santa Clara Cnty. Sheriff*, 2024 WL 3522059, at *3 (N.D. Cal. July 23, 2024) (citing *Doty v. County of Lassen*, 37 F.3d 540, 546 (9th Cir. 1994); *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982)). Plaintiff adequately alleges that Banks had a heightened suicide risk and mental health needs. Thus, Plaintiff sufficiently alleges the first prong of her Eighth Amendment medical needs claim.

Regarding deliberate difference, viewing the facts in the light most favorable to Plaintiff and drawing all inferences in her favor, "the circumstances suggest that [these Defendants] had been exposed to information concerning the risk and thus 'must have known about it.'" *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1245 (9th Cir. 2010) (quotation marks omitted) (quoting *Farmer*, 511 U.S. at 842), *overruled in part on other grounds by Castro*, 833 F.3d 1060. Johnson and Rausin knew of Banks' lengthy mental health history, knew he suffered side effects from medication, and knew that medication changes caused his mental health to decline, yet they did not monitor his mental health closely enough or ensure that he was not suffering from bad effects from his significant medication changes. Although Plaintiff does not sufficiently allege that these Defendants should have put Banks on suicide watch, at this stage of the litigation, Plaintiff has alleged sufficient facts against Johnson and Rausin to survive a motion to dismiss with respect to Plaintiff's Eighth Amendment psychiatric medical needs claim.

Claim Three alleges a failure to protect claim. A prison official violates the duty to protect when two requirements are met.

> First, objectively viewed, the prison official's act or omission must cause a substantial risk of serious harm. Second, the official must be subjectively aware of that risk and act with deliberate indifference to inmate health or safety. In other words, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Cortez v. Skol*, 776 F.3d 1046, 1050 (9th Cir. 2015) (cleaned up). "The objective question of whether a prison officer's actions have exposed an inmate to a substantial risk of serious harm is a question of fact, and as such must be decided by a jury if there is any room for doubt." *Lemire*, 726 F.3d at 1075-76. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842.

Plaintiff alleges that Superintendent Fhuere, Dr. Dravis, Johnson, Rausin, and Dr. Huard "failed to inform the officers of the serious need for consistent tier checks" and the medical providers showed deliberate indifference because they knew Banks was a patient with "heightened suicidal conditions," and Fhuere showed deliberate indifference because he failed to implement safeguards for mentally disabled inmates. SAC ¶¶ 207, 215-16. Plaintiff also alleges that the officers themselves failed appropriately to conduct the tier checks. *Id.* ¶ 213.

Plaintiff's allegations in this claim against Superintend Fhuere are duplicative of Plaintiff's supervisory claim, Claim Four. Plaintiff does not allege personal conduct by Superintendent Fhuere other than his failure as a supervisor to ensure that proper tier checks were conducted. Thus, Plaintiff fails to state a claim against Superintendent Fhuere in his individual capacity. Similarly, Plaintiff fails to allege facts against Dr. Dravis in his individual capacity, rather than alleging that he improperly supervised other medical personnel.

As for the officers, Plaintiff alleges that Corporal Johnson and Officer Wagner failed properly to monitor Banks' cell the night of his death.[12] Officer Praska is alleged to have found Banks and called for help, and Officers Burghardt and Wright are two of the officers alleged to

---

[12] Plaintiff also alleges that Officer Smith failed properly to monitor Banks' cell that night, but Plaintiff has agreed to dismiss the claims against Officer Smith.

have responded to assist Officer Praska. These officers allegedly performed various actions to remove Banks from his bunk and attempt to resuscitate him. This conduct occurred after Banks had died. Plaintiff alleges no other *facts* regarding these officers and no facts regarding Officer McKinney.[13] Plaintiff does not allege when these officers went on duty or that they should have monitored Banks before Praska discovered Banks at 9:45AM. Thus, Plaintiff fails to state a failure to protect claim against these officers.

Regarding Johnson, Rausin, Officer Wagner, and Corporal Johnson, Plaintiff alleges sufficient facts to create "room for doubt," *Lemire*, 726 F. 3d at 1076, as to the objective component of her failure to protect claim—that the actions of these Defendants caused a substantial risk of serious harm. Whether these Defendants were subjectively aware of facts from which an inference could be drawn that a substantial risk of serious harm existed generally is a question of fact, *Farmer*, 511 U.S. at 842, and "thus is not a question to be answered at the pleading stage of litigation." *Melendez v. Diaz*, 2022 WL 1063191, at *7 (E.D. Cal. Apr. 8, 2022); *see also Lemire*, 726 F.3d at 1078 (noting that the failure to protect "inquiries are fact-intensive and typically should not be resolved [even] at the summary judgment stage"). Additionally, as discussed above in Plaintiff's failure to train claim, Plaintiff has alleged facts that it was obvious that not informing the officers of the need to monitor vulnerable BHU inmates would create a substantial risk of harm. Similarly, for the officers themselves, failing to check on high risk inmates in the BHU obviously creates a substantial risk of harm to such inmates. This obviousness suffices to allege the subjective component of a failure to protect claim.

_____

[13] Plaintiff alleges some additional legal conclusions that the Court does not accept as true.

The facts alleged in Claim Four against Superintendent Fhuere relate only to his role as a supervisor and thus do not support a claim against him personally. It is unclear what claim Plaintiff intends to assert against Dr. Millius in Claim Four. Plaintiff alleges that Dr. Millius produced a "dishonest or inaccurate" autopsy report and in so doing "intentionally disregarded the serious medical need" of Banks. This appears to be an Eighth Amendment claim based on Dr. Millius' alleged failures in her autopsy report. Plaintiff offers no authority that conducting an autopsy can support an Eighth Amendment claim. There are no allegations that doing so caused a deprivation of Banks' rights, as he already was deceased. Additionally, omitting the fact that an N95 mask was pulled from Banks' throat from the autopsy report and taking a position on Banks' body position when there was conflicting evidence does not amount to deliberate indifference under the Eighth Amendment.

Claim Five is brought solely against Dr. Dravis, alleging that he knew or should have known of his staff's actions allegedly violating Banks' rights under the Eighth Amendment. Each of the allegations in Claim Five, however, are about Dr. Dravis in a supervisory role. Plaintiff makes no allegation about Dr. Dravis's personal conduct, and does not sue Dr. Dravis in his supervisory capacity.

### ii. Claims concerning involuntary medication

Claims six through eight involve Banks' allegations of involuntary medication. Claim Six alleges a violation of the Fourteenth Amendment's Due Process Clause with respect to Defendants' involuntary medication decision. Although Claims Seven and Eight are styled differently,[14] they are both First Amendment retaliation claims relating to Banks' statements about his medication.

---

[14] Plaintiff labels Claim Seven "1st Amendment; Freedom of Speech" and Claim Eight "1st Amendment; Retaliation," but the substance of Claim Seven also is retaliation.

PAGE 23 – OPINION AND ORDER

The basis of Plaintiff's Fourteenth Amendment due process claim is unclear. Plaintiff cites Rule 17(c) of the Federal Rules of Civil Procedure and federal cases about appointing a guardian ad litem to protect the interests of a mentally incompetent person, and the federal court conducting a competency hearing. Banks, however, was not tried in federal court, so it is unclear why Plaintiff cites this federal authority. Plaintiff next alleges that Banks waived his right to attend his jail *disciplinary* hearing. Plaintiff then alleges that OSP has a policy where a mentally incompetent person cannot make a decision regarding medication. It is unclear if Plaintiff is alleging that Banks was not competent to waive his right to attend or should have been appointed a guardian with respect to his disciplinary hearing or his involuntary medication process. In any event, this is a Fourteenth Amendment due process claim regarding Banks being given involuntary medication. What matters is the process Banks was due on that matter.

"[G]iven the requirements of the prison environment, the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." *Washington v. Harper*, 494 U.S. 210, 227 (1990). The Due Process Clause does not require a judicial hearing, nor that an inmate be deemed incompetent before being involuntarily medicated. *Id.* at 222-23, 226, 231. A policy under which a psychiatrist prescribes the medication and a reviewing psychiatrists concurs, and the state "establish[es], by a medical finding, that a mental disorder exists which is likely to cause harm if not treated" suffices to meet due process requirements. *Id.* at 222-23. The Supreme Court explained "that an inmate's interests are adequately protected, and perhaps better served, by allowing the decision to medicate to be made by medical professionals rather than a judge." *Id.* at 231. There needs to be adequate procedural safeguards, such as hearing committee members who are not involved in the regular

treatment of the inmate, notice, an opportunity to be heard, and the right to present and cross-examine witnesses. *Id.* at 233-35. An attorney, however, need not be appointed to an inmate. *Id.* at 236. The presence of an independent lay person who understands psychiatric issues is sufficient. *Id.* Oregon codified these procedural protections in OAR 291-064-0100(1).

Plaintiff alleges that Dr. Huard recommended Banks be involuntarily medicated, Dr. Dravis approved that recommendation, and Dr. Pardilla was the outside consultant to review and determine whether to proceed. Plaintiff's allegations regarding the process after this point are less clear. In his response brief, Plaintiff asserts that Banks was provided verbal but not written notice of the opportunity to be heard regarding his involuntary medication, but that is not alleged in the SAC. The SAC alleges that there was a written form initiating the involuntary medication and that Rausin signed that Banks refused to sign that written form, which supports that Banks was provided with notice of that written form. The SAC also alleges that Rausin initialed that Banks did not appeal the involuntary medication decision on the appeals process form.[15] As discussed, the allegations regarding Banks' refusal to attend his involuntary medication process, disciplinary process, or both, are muddled. Plaintiff does allege, however, that Dr. Pardilla's records show that Banks "failed to appear for appointment," suggesting that an appointment was scheduled and the failure was on Banks' part.

These allegations show that Banks was provided with sufficient due process as required under *Harper*. OSP provided notice and *offered* Banks the required process, but Banks did not participate. "[W]here adequate administrative procedures exist, a person cannot state a claim for denial of procedural rights when he has elected to forego a complete hearing." *Correa v. Nampa Sch. Dist. No. 131*, 645 F.2d 814, 817 (9th Cir. 1981).

---

[15] Under OAR 291-064-0130, an inmate has 24 hours to appeal the involuntary medication decision to the facility's Chief Medical Officer.

Plaintiff's allegation regarding appointing a guardian ad litem are unclear and, regardless, a guardian ad litem is not required under *Harper* to ensure constitutionally sufficient due process. Plaintiff cites no authority requiring a guardian ad litem for due process, other than Rule 17 of the Federal Rules of Civil Procedure, which does not apply to internal state prison proceedings and does not establish due process requirements. Plaintiff also argues that Dr. Pardilla had an obligation to interview witnesses and ensure that Banks was not rejecting involuntary medication because of side effects, and the Individual State Defendants were required to ensure this process occurred. Plaintiff cites OAR 291-064-0110 for this contention.[16] Plaintiff cites no authority that this Oregon regulation creates a *constitutional due process* requirement. To the contrary, prison regulations "are not designed to confer rights on inmates." *Sandin v. Conner*, 515 U.S. 472, 482 (1995). Ultimately, due process is about the process offered to the inmate. The Court must consider whether *Banks* was offered the opportunity to be heard, to present witnesses, and to cross examine witnesses. *See Harper*, 494 U.S. at 235. That does not impute an independent obligation on Dr. Pardilla to do so in Banks' absence or on the Individual

---

[16] This regulation establishes the scope of review for the independent reviewing physician, and provides that the physician shall:

> (a) Review the inmate's treatment record, including the records of efforts made to obtain informed consent;
>
> (b) Discuss the matter with the inmate and witnesses;
>
> (c) Review the evidence presented by the Department upon which the recommendation for involuntary administration of medications is based; and
>
> (d) Consider additional information, if any, presented at the time of the review by the inmate, the advisor, the Department, or witnesses.

OAR 291-064-0110(1).

PAGE 26 – OPINION AND ORDER

State Defendants to ensure that Dr. Pardilla did so. As alleged by Plaintiff, Banks was provided the appropriate process, although he declined to use that process.

Plaintiff alleges that Dr. Millius produced a dishonest report of Banks' death. Plaintiff fails to show how this is connected to any due process violation.

Plaintiff's Seventh Claim alleges that the Individual State Defendants ignored Banks' complaints about his "bad physical responses" to his medication and retaliated against him for those complaints by placing him on involuntary medication.[17] To state a claim for First Amendment retaliation in the prison context, a plaintiff must allege "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005). To establish a retaliatory motive, an inmate "must show that his protected conduct was the substantial or motivating factor behind the defendant's conduct." *Johnson v. Ryan*, 55 F.4th 1167, 1201-02 (9th Cir. 2022).

The problem with Plaintiff's claim is that she alleges Banks complained about his medication to "staff" and to Johnson. Plaintiff then alleges that "Defendants" retaliated by placing Banks on involuntary medication. But it was not all Defendants who decided to place Banks on involuntary medication. Plaintiff alleges that Dr. Huard made the recommendation and Dr. Dravis approved it. Plaintiff alleges no facts supporting that Banks' complaints about side effects of his medication was the substantial or motivating factor behind these doctors'

---

[17] Plaintiff makes a general allegation that "Defendants ignored [Banks'] right to be heard by allowing the administrative process to go forward without the required interview of parties and witness required under Oregon's Administrative Rules." SAC ¶ 273. This is duplicative of Plaintiff's due process claim. Nor does it support a First Amendment claim because, as discussed above, Oregon prison regulations do not establish constitutionally protected conduct.

recommendation. Indeed, Plaintiff alleges that the incident where Banks spit on a correctional officer was the event that "triggered steps within the facility to place [Banks] on involuntary medication." SAC ¶ 73.

Additionally, Dr. Pardilla was the independent medical reviewer who determined whether Banks should be medicated. Plaintiff alleges no facts showing that Dr. Pardilla was persuaded by Johnson or other staff because of Banks' complaints about medication side effects. Nor does Plaintiff allege any facts showing that the involuntary medication did not reasonably advance a legitimate correctional goal. Thus, Plaintiff fails to allege that Banks was put on involuntary medication in retaliation for complaining about his medication.

For Plaintiffs' Seventh Claim, Dr. Millius is stated to have produced an inaccurate report of Banks' death. This is not an action that would violate Banks' freedom of speech, as he was already dead, nor are any facts alleged that support it was done in retaliation for any protected conduct. Thus, Plaintiff does not state a First Amendment claim against Dr. Millius.

Plaintiff's Eighth Claim alleges that "Banks asked to be taken off psychotropic drugs, and when that occurred, the facility retaliated with involuntary medication and solitary confinement." SAC ¶ 288. Plaintiff's claim that involuntary medication was retaliatory fails for the reasons previously discussed, but Plaintiff also alleges other acts of retaliation by officers against Banks, stating that he was deprived of certain "privileges" after "speaking up about his desire to go off psychotropic medication." SAC ¶ 292. Taking the deprivation of these privileges as true, the first element of a First Amendment retaliation claim is satisfied. *See Wilson v. Nesbeth*, 341 F. App'x 291, 293 (9th Cir. 2009) (holding that for a motion to dismiss "allegations of harm were sufficient to ground a First Amendment retaliation claim without discussing whether that harm had a chilling effect").

PAGE 28 – OPINION AND ORDER

To meet the causation element a plaintiff must show that the adverse action resulted from the protected conduct, which a timeline of events may satisfy. "Because direct evidence of retaliatory intent can rarely be pleaded in a complaint, allegation of a chronology of events from which retaliation can be inferred is sufficient to survive dismissal." *Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012). As discussed above, Plaintiff alleges that Banks was deprived exercise, use of the day room, access to television, and other amenities in retaliation for speaking out against medication. SAC ¶ 289. But Plaintiff also alleges that because Banks *was housed in the BHU*, he was denied these privileges. SAC ¶ 176(d). Plaintiff does not allege that Banks was housed in the BHU in retaliation for his complaints about his medication. To the contrary, Plaintiff alleges that Banks previously was housed in the BHU when he was jailed at OSP. *Id.* ¶ 28. Plaintiff also alleges that he was deprived of these amenities because he placed in disciplinary segregation after spitting on the officer. *See id.* ¶ 73. Plaintiff needs to more clearly allege when and how Banks was deprived of the amenities to adequately allege this claim. Plaintiff also must allege such conduct did not adequately advance a legitimate correctional goal.

Plaintiff further alleges that Banks was deprived of blankets, sheets, and towels. This was ordered in response to Banks using blankets to tie his cell door closed. There may be a temporal proximity to Banks' deprivation of these items after speaking up about his desire to stop being administered psychotropic medication, but Plaintiff does not plausibly allege that these deprivations did not reasonably advance a legitimate correctional goal. Thus, Plaintiff fails sufficiently to allege a First Amendment retaliation claim in Claim Eight.

**B.  Defendant Dr. Pardilla**

Plaintiff brings only Claims Six and Seven against Dr. Pardilla, suing Dr. Pardilla in his individual capacity. As an independent physician brought in by ODOC, Dr. Pardilla was acting under color of state law at the relevant time. *See West v. Atkins*, 487 U.S. 42 (1988) (holding that

PAGE 29 – OPINION AND ORDER

independent physicians who contract with prisons to provide medical services to inmates are acting under color of state law for purposes of § 1983).

Plaintiff alleges that Dr. Pardilla violated Banks' Fourteenth Amendment Due Process rights by failing to interview Banks and witnesses in accordance with OAR 291-064-0110(b) before deciding that involuntary medication should be administered. As discussed above, Dr. Pardilla's alleged violation of this regulation does not amount to a constitutional violation and Plaintiff fails to allege that Dr. Pardilla's failure to interview witnesses was a violation of *Banks'* due process rights.

Plaintiff's Seventh Claim alleges that Dr. Pardilla violated Banks' rights under the First Amendment. As with the Individual State Defendants, Plaintiff fails to state a claim that Dr. Pardilla retaliated against Banks for complaining (to other staff) about side effects of medication. To the contrary, Plaintiff alleges that Dr. Pardilla specifically noted that Banks did not complain about side effects. Although Plaintiff alleges that statement was factually incorrect, it is fatal to Plaintiff's Seventh Claim against Dr. Pardilla. If Dr. Pardilla believed, even erroneously, that Banks did not complain about side effects, Dr. Pardilla could not have been retaliating against Banks for complaining about side effects. Nor does Plaintiff allege that Banks was engaged in any other constitutionally protected conduct that was the motivating factor for Dr. Pardilla's evaluation of whether to put Banks on involuntary medication.

## C.  Defendant Dr. Huard[18]

### 1.  Disability Accommodation

Dr. Huard incorporates by reference the motions her co-defendants. *Id.* at 2. Accordingly, the Court dismisses Plaintiff's disability accommodation claim against Dr. Huard, who is sued in her individual capacity, for the same reasons the Court dismisses this claim against the Individual State Defendants.

### 2.  § 1983 Claims

Plaintiff brings Claims Two and Three against Dr. Huard, asserting the same allegations that the Court found sufficient to state these claims against Johnson and Rausin. For the same reasons, Plaintiff states an Eighth Amendment medical needs claim (Claim Two) and failure to protect claim (Claim Three) against Dr. Huard.[19]

The Court dismisses Plaintiff's Sixth Claim, alleging a Fourteenth Amendment due process violation relating to Banks being placed on involuntary medication, for the same reasons the Court dismissed this claim against the Individual State Defendant medical providers. The

---

[18] Plaintiff states that Dr. Huard has no license to practice psychology but has been diagnosing and treating mental disorders. SAC ¶ 11. Dr. Huard notes that she is board certified in psychiatry. ECF 28 at 3. Dr. Huard's license to practice psychiatry, however, is not dispositive of the issues raised in the pending motion.

[19] Dr. Huard cites *Simmons* to argue that the alleged facts do not show that Banks was in *acute* danger of committing suicide. Banks need not have been in acute danger of committing suicide for Dr. Huard to have failed properly to treat Banks' mental health problems. Furthermore, *Simmons* was decided at summary judgment. On a motion to dismiss, the Court accepts Plaintiff's allegations as true, draws all reasonable inferences in her favor, and only considers whether she plausibly has stated a claim. *See Mashiri,* 845 F.3d at 988; *see also Hearns v. Terhune*, 413 F.3d 1036, 1043 (9th Cir. 2005) ("The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800 (1982))). This difference is particularly striking in the context of objective and subjective elements that generally require factual development.

Court also dismisses Plaintiff's First Amendment retaliation claims, Claims Seven and Eight, because they do not allege facts showing that Dr. Huard took adverse action against Banks because he was engaged in protected conduct, that Dr. Huard's action chilled Banks' First Amendment rights, or that Dr. Huard's action did not reasonably advance a legitimate correctional goal. *See Rhodes*, 408 F.3d at 567-68.

**D.  Summary**

The Court allows the following claims to proceed:

- Claim One, Disability Accommodation, against ODOC and OSP (the nonmoving Defendants);
- Claim Two, Eighth Amendment Medical Care, against Ka Rin Johnson, Rausin, and Dr. Huard;
- Claim Three, Eighth Amendment Failure to Protect, against Ka Rin Johnson, Rausin, Dr. Huard, Officer Wagner, and Corporal Johnson; and
- Claim Four, Eighth Amendment, Failure to Protect, against Superintendent Fhuere in his supervisory capacity for failure to implement policies and failure to train regarding cell searches and tier checks.

The Court dismisses the following claims:

- All Claims against Superintendent Fhuere and Dr. Milius in their official capacity ;
- All Claims against Dr. Millius in her supervisory capacity;
- Claim One, Disability Accommodation, against all Moving Defendants;
- Claim Two, Eighth Amendment Medical Needs, against Dr. Dravis;
- Claim Three, Eighth Amendment Failure to Protect, against Dr. Dravis, Superintendent Fhuere (individual), and Officers Praska, Burghardt, Wright, and McKinney;
- Claim Four, Eighth Amendment, against Dr. Millius (supervisory and individual), Superintendent Fhuere (individual);
- Claim Five, Eighth Amendment, against Dr. Dravis;
- Claim Six, Fourteenth Amendment Due Process, against all Defendants;
- Claim Seven, First Amendment Retaliation, against all Defendants; and
- Claim Eight, First Amendment Retaliation, against all Defendants.

**CONCLUSION**

The Court GRANTS Dr. Pardilla's Motion to Dismiss, ECF 26; GRANTS IN PART and DENIES IN PART the Individual State Defendants' Motion to Dismiss, ECF 27; and GRANTS IN PART and DENIES IN PART Dr. Huard's Motion to Dismiss, ECF 28. Plaintiff may file a Third Amended Complaint by October 14, 2025.

**IT IS SO ORDERED**.

DATED this 30th day of September, 2025.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge