**Wayne A. Lamb - Law**
Wayne Lamb
183B High St NE
Salem, OR 97301
Telephone: 503-877-2227
Email: wayne@wlamblaw.com
Attorneys for Plaintiff

UNITED STATED DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| PATRICIA "TRISH" NEMETH, individually and as the personal representative of the ESTATE OF JESSE BANKS, <br><br> Plaintiffs, <br><br> vs. <br><br> OREGON DEPARTMENT OF CORRECTIONS (ODOC); OREGON STATE PENITENTIARY (OSP); COREY FHUERE, Superintendent; DR. DON DRAVIS (Chief of Psychiatry), Official Capacity; KA RIN JOHNSON LCSW, QMHP, individually; BERNADETTE LOUISE HUARD, MD., individually; JESSICA RAUSIN (MS, QMHP), individually; CORPORAL DUSTIN JOHNSON, individually; OFFICER ALEX WAGNER, individually; <br><br> Defendants. | Case No. 6:24-CV-01355-SI <br><br> FOURTH AMENDED COMPLAINT <br><br> Wrongful Death <br> American Disabilities Act <br> Civil Rights Violations <br> 8th Amendment Failure to Protect <br><br> 42 U.S.C. § 1983 <br><br> *(Damages request for $20,000,000, exceeding $10,000 and not subject to mandatory arbitration)* <br><br> Jury Trial Demanded |

INTRODUCTION

This case is about the tragic premature death of Jesse Banks, a young man in his mid-thirties, who with 'good time' had less than two years left on his 37-month, prison sentence. Jesse Banks' life was taken by the intentional, reckless, and

PAGE 1      FOURTH AMENDED COMPLAINT

**WAYNE A. LAMB LAW, LLC**
183B High St. NE
Salem, OR 97301
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

deliberately indifferent actions of the personnel of the Oregon Department of Corrections (ODOC). He had frequent calls with family and letters to friends that always suggested optimism for his release, plans for continued magazine subscriptions, and plans to work with his uncle upon his release.

Mr. Banks suffered from a pervasive developmental disorder. He was housed in the Behavioral Health Unit ("BHU") at Oregon State Penitentiary (OSP). Despite its name, the BHU operated as solitary confinement for Jesse Banks on the tier that he was housed on. Even though ODOC was notified of Mr. Banks's disability, he was denied necessary accommodations, and he was placed in disciplinary segregation or otherwise held in solitary confinement for the majority of his sentence where his mental health continued to deteriorate. Several members of OSP personnel failed to follow its own policies and procedures along with Oregon's Administrative Rules on Behavioral Health Units and AICs in segregation. Those rules are specifically designed to prevent unexpected in custody deaths by requiring 15-minute and 30-minute tier checks, respectively.

Additionally, OSP personnel failed to take necessary steps to ensure security checks were performed on mentally ill persons. The death investigation of Jesse Banks was significantly hampered by the State's medical examiner by either refusing to note or inexplicably ignoring obvious evidence found at the investigation or during the autopsy. The evidence was important to the finding of "suicide." Oregon State Police Detective Dunleavy noted that he watched the autopsy performed by Dr. Millius. He observed:

> **"An N-95 mask was found in the mouth of the decedent. It was ripped in half, with one half rolled-up inside the other and stuffed in the back of the mouth. The outside half of the mask was reddish-brown in color."**

Dr. Millius did not note anywhere in her autopsy that there was a bloody N-95 mask was stuffed in the back of Jesse Banks' mouth. There is no mention of an N-95 mask. There is no mentioned of a mask ripped in two and one side neatly rolled inside

PAGE 2     FOURTH AMENDED COMPLAINT

**WAYNE A. LAMB LAW, LLC**
183B High St. NE
Salem, OR 97301
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

of the other. There is no mention of blood or fluid in the mouth, which would indicate a higher likelihood of murder, rather than suicide. In the autopsy, there is no mention of anything in the throat. Verbatim, her report reads, "Neck: the upper airway is not obstructed." There was either intent to bury evidence, or there was an inexplicable lack of diligence or desire to determine the actual cause of death of Jesse Banks or of an AIC with mental health issues who passed away on a mental health tier of the prison facility.

The body of Jesse Banks was found in a position that would not suggest self-harm. His body position would have restricted leverage for "self-inflicted hanging." Mr. Banks's body was found with a small state-issued blanket draped over his whole body, so he was not visible from the door. Tier checks were required every thirty minutes and were ordinarily performed as such, except for the 90 minutes before breakfast where Mr. Banks did not answer Officer Wagner, when Officer Wagner knocked and summoned Mr. Banks for breakfast. That failure was immediately followed by a 174-minute interval where tier checks were further ignored by Officer Johnson.

Officer Praska found Jesse Banks's cold, purple, body in full rigor around 9:45 a.m. Those gaps in time demonstrate deliberate indifference to a clear policy to perform checks every fifteen minutes for AICs with a high-risk of suicide and thirty minutes for segregated individuals. Those administrative rules are specifically designed to avoid prison deaths by suicide. Officer Wagner did not check on Jesse Banks when he did not answer for breakfast on the morning before Jesse Banks was found dead in his cell.

Mr. Banks was in solitary confinement on the morning when he died, in the Mental Health Unit (MHU) or in the Behavioral Health Unit (BHU), so no adult in custody could have been responsible for his death.

On a psychiatric tier, whether Jesse Banks was killed in his cell by a guard, or whether the death was a suicide due to failure to perform welfare checks during extreme dosage increase is irrelevant for liability. That question only goes to damages.

**WAYNE A. LAMB LAW, LLC**
183B High St. NE
Salem, OR 97301
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

The state actors were deliberately indifferent to the serious medical needs of Mr. Banks, either by strangling him to death, or by significantly increasing his dosage of an inmate with known schizophrenia and depression, as well as a known history of suicide attempts, and they left him unattended for several hours while they had the responsibility to perform tier checks every 15 minutes.

Two undissolved pills ("Invega") were found in Mr. Banks's stomach. Those pills were given to Mr. Banks in addition to Invega injections that he had been prescribed. Those injections are supposed to occur monthly and are typically intended to "supplant" or be used "in place of" Invega pill prescriptions, not to be used "in addition to."

OSP medical staff elected to administer both doses (oral and injection) – and then some. Jesse Banks was prescribed Invega, 3mg on 12/30/23, upped to 6mg on 1/6/23, upped to 9mg on 2/2/23, and increased to 12mg of Invega orally on 3/16/23. He was then decreased to *6 MG on 3/30/23, two days before his death*. He was additionally prescribed involuntary injections of Invega of 234mg (once to start the regimen) and 156 mg (monthly, thereafter). Mr. Banks was administered 256mg on 3/27/23 two days before his death to go along with his newly increased 12mg nightly dose.

In sum, ODOC is responsible in either case: (a) one of the morning guards, likely Wagner or Johnson, intended to kill Jesse Banks and succeeded in killing him, or (b) the medical staff and Wagner and Johnson ignored the prisoner's mental health needs to be frequently checked and their deliberate indifference caused Jesse Banks's death.

Plaintiff asserts that Mr. Banks was killed in his cell by asphyxiation by a state employee when the N-95 mask was "stuffed" into the throat of Jesse Banks and buried as evidence at the autopsy. Alternatively, Dr. Huard significantly altered Mr. Banks's medication in the week before his death without ensuring the necessary protective protocols were in place. It was deliberately indifferent to Mr. Banks's serious medical needs to ignore the need for continuous observation or persistent tier checks during that period. Additionally, Dr. Huard & administering staff gave involuntary medication in

PAGE 4    FOURTH AMENDED COMPLAINT

**WAYNE A. LAMB LAW, LLC**
183B High St. NE
Salem, OR 97301
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

violation of Due Process and in violation of Mr. Banks Fourteenth and First Amendment rights.

## JURISDICTION

1.      This court has jurisdiction over the subject matter of this Complaint under 42 U.S.C. §§ 1983 and 12101 et seq., and 28 U.S.C. §§ 1331, 1343(a)(3), and 1343(a)(4). Pendent jurisdiction is asserted for a separate state law claim under 28 USC § 1367.

## VENUE

2.      Venue is proper within the District of Oregon because all of the events giving rise to this claim occurred in this judicial district, and all Defendants reside in this judicial district. 28 U.S.C. § 1391(b). Specifically, all of the acts and practices alleged herein occurred at Oregon Department of Corrections Facilities in Salem, Oregon.

## PARTIES

3.      **Decedent, Jesse Michael Banks**, was an adult in custody ("AIC"), lodged at Oregon State Penitentiary (OSP), located at 2605 State St, Salem, OR 97310. During the relevant period, Mr. Banks was under the care, custody, and control of the Defendants.

4.      **Plaintiff, the Estate of Banks**, by and through the Personal Representative for the Estate, Trish Nemeth, is an adult currently residing in 264 Buzz St., Unit 21, Branson, MO 65616. Trish Nemeth is the mother of the decedent, Jesse Michael Banks, and she is the personal representative of the Estate of Jesse Banks and brings this lawsuit as personal representative on behalf of the Estate of Jesse Banks pursuant to ORS 30.020.

5.      **Plaintiff Patricia Nemeth**, aka Trish Nemeth is an adult currently residing in Branson, Missouri. Ms. Nemeth is the mother of decedent Jesse Michael Banks, is the personal representative of the Estate of Jesse Banks, and brings this lawsuit individually and on behalf of the Estate of Jesse Banks pursuant ORS 30.020.

PAGE 5      FOURTH AMENDED COMPLAINT

**WAYNE A. LAMB LAW, LLC**
183B High St. NE
Salem, OR 97301
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

6. **Defendant, Oregon Department of Corrections (ODOC)** is an administrative agency of the State of Oregon. Defendant was acting at all relevant times in the scope of its administrative capacity and under color of Oregon State law.

7. **Defendant, Oregon State Penitentiary**, located at 2605 State St, Salem, OR 97310, is a facility operated and funded by ODOC, an administrative agency of the State of Oregon. OSP was acting at all relevant times in the scope of its administrative capacity and under color of Oregon State law.

8. **Defendant Corey Fhuere** is the superintendent of the Oregon State Penitentiary ("OSP") and an employee of the Oregon Department of Corrections. He is sued in his individual, supervisory and official capacity. As superintendent, Mr. Fhuere is ultimately responsible for all aspects of a well-run institution. As such, he is responsible for directing the daily operation of the institution in compliance with federal statutes, correctional case law, and ODOC rules and procedures. At all times relevant, Mr. Fhuere was acting under color of state law.

9. **Ka Rin Johnson (LCSW, QMHP)** is a licensed mental health worker who is employed by ODOC and is sued in her individual capacity. At all times relevant, she was acting under color of state law.

10. **Dr. Bernadette Louise Huard, MD,** is a mental health worker who is employed by ODOC and is sued in his individual capacity. He/She, as of the date of Mr. Banks's death, had been a Mental Health Specialist at ODOC at relevant times. At all times relevant, Dr. Huard was acting under color of state law.

11. **Dr. Don Dravis** is a mental health worker who is employed by ODOC and is sued in his Official (supervisory) capacity. He was the Chief of Psychiatry at ODOC at relevant times. Mr. Dravis was entrusted by ODOC to oversee the deployment of services for diagnosis and treatment of behavioral, emotional, and mental disorders. At all times relevant, Ms. Dravis was acting under color of state law.

12. **Jessica Rausin (MS, QMHP) (formerly, Jessica Haynes)**, is a licensed

**WAYNE A. LAMB LAW, LLC**
183B High St. NE
Salem, OR 97301
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

mental health worker who is employed by ODOC and is sued in her individual capacity. At all times relevant, she was acting under color of state law.

13. **Corporal Dustin Johnson** was employed as a correctional officer at ODOC and is sued in his individual capacity. During all relevant time periods, he was a correctional officer in the DSU at OSP. At all times relevant, Officer Johnson was acting under color of state law.

14. **Officer A. Wagner** was employed as a correctional officer at ODOC and is sued in his individual capacity. During all relevant time periods, he was a correctional officer in the DSU at OSP. At all times relevant, Officer Wagner was acting under color of state law.

15. **Rebecca Millius, MD.** is a medical examiner for the State Medical Examiner's Office (MEO) and an employee of the MEO. As the medical examiner, Ms. Millius is ultimately responsible for all aspects of a careful and accurate autopsy, examination, and reporting relating to in-custody deaths. Her reports are transmitted to next of kin. ensure its own compliance with federal statutes, case law, and ODOC rules and procedures.

STATEMENT OF FACTS

1. **BACKGROUND**

16. In 2018, Jesse Banks went to prison at Oregon State Penitentiary (OSP) for 38 months. He was housed in the behavioral health unit (BHU), where he received continuous mental health evaluations and treatment.

17. He was again sentenced in 2022 on felony charges, where he received another 36 months in ODOC. He was again sent to OSP, and he was again housed in BHU, where he received another round of continuous mental health evaluations and treatment, until April 1, 2023, when he was found dead in his cell, which was deemed a suicide.

18. Jesse Banks was charged with four counts of aggravated harassment and

PAGE 7    FOURTH AMENDED COMPLAINT

**WAYNE A. LAMB LAW, LLC**
183B High St. NE
Salem, OR 97301
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

one count of assaulting a public safety officer on December 9th, 2021. Jesse Banks was homeless when he was arrested and prior to the arrest he had been homeless off-and-on for years.

19. Mr. Banks had eleven criminal cases from 2006 to 2021. In all cases involving felony charges after 2006, his mental health concerns were raised by the court or his attorneys. The only cases that show no record of mental health concerns were misdemeanor cases, which oftentimes have less interaction between client and attorney. Jesse Banks was found unfit at to proceed in his cases on several occasions. He was found unfit on a 2014 case, again on a 2015 case, and more recently, he was found unfit to proceed on criminal cases in 2018 and 2021.

20. In 2018, he was found unfit in Washington County, but his mental health was restored at OSH, so he was competent to stand trial. He did stand trial, and he was sentenced to 38 months on Felony charges. He was transported to Oregon State Penitentiary, where he was housed in BHU.

21. In 2021, Mr. Banks was found unfit to proceed and a dismissal was ordered in Washington County for a misdemeanor offense.

22. Again in 2021 only a few months later, in Case No. 21CR59929, Jesse Banks was found unfit to aid and assist his attorneys, but later he was restored to a level that was considered "competent to stand trial" in Marion County on felony charges.

23. He was ultimately sentenced to three years in ODOC, and that was the case that landed him back in Oregon State Penitentiary, housed again in BHU, in cell 34, where he died.

24. Aid and assist concerns were raised in every felony case by every attorney who represented Mr. Banks after 2006.

25. Jesse Banks was found unfit to proceed in a misdemeanor case in Washington County on March 25, 2022.

26. During that case, he was in jail for several months and released to the

PAGE 8    FOURTH AMENDED COMPLAINT

**WAYNE A. LAMB LAW, LLC**
183B High St. NE
Salem, OR 97301
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

community under supervision and care.

27.    That recommendation was made by OSH during their observation of Mr. Banks during his incarceration from May 2022 to November 2022.

28.    Only a few months later, Mr. Banks was found fit to proceed on felony charges in Marion County, where he was sentenced to three years in prison.

29.    Mr. Banks was transported to OSP where he eventually died in his cell. OSP had ample information of Jesse Banks' mental health history through its own investigations and evaluations of Mr. Banks and from his prior ODOC stint and through the exchange of information through OSH.

30.    Mr. Banks was transported to OSH for his developmental disability during his prior prison sentence. At that time, he was in OSP and in BHU on his 2018 sentence. In other words, this exact unit (BHU) and facility (OSP) specifically transferred Mr. Banks to OSH and was aware of suicidal history.

31.    It had additional knowledge through its communications with OSH and through the information delivered to it by the sentencing court.

32.    Additionally, OSP had a history with Jesse Banks through Mr. Banks's previous incarceration at OSP in 2018 for several years.

33.    OSP and its guards and medical providers had a long history of interaction with Mr. Banks.

34.    Jesse Banks remained incarcerated until his conviction on 10/31/2022. He remained at OSP until his death in the middle of the night on March 31, 2023, or the morning of April 1, 2023.

35.    The rigor mortis observed, combined with the undissolved pills in the stomach will allow the parties to identify whether he died just after dinner or just after breakfast within a couple of hours of being given the pills.

36.    There was an encounter, a month prior to Mr. Banks's death. On or around February 23, 2023, Mr. Banks tied his blankets around the door in a way that

PAGE 9    FOURTH AMENDED COMPLAINT

**WAYNE A. LAMB LAW, LLC**
183B High St. NE
Salem, OR 97301
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

blocked the door from opening.

37. The officers present at that encounter were the following officers:
   a. Officer Ruiz,
   b. Officer R. Hedges
   c. C/O S. Pries
   d. Officer D. Urbach (Officer in Charge)
   e. **Officer Banning,**
   f. Officer R. Gowey
   g. **Corporal D. Johnson,**
   h. **Officer M. Praska**, and
   i. Lieutenant E. Trimble.

   *\*\*\*Bold Denotes Officers known to be at both scenes\*\*\**

38. Officer Ruiz sent tear gas into the cell to get Mr. Banks out from under his bed and to exit his cell. That was the action that concluded the encounter. Mr. Banks came out from under his bed and submitted to restraints.

39. As an additional measure, Mr. Banks was issued a deprivation order where he was not permitted blankets, sheets, or towels.

40. A month later, Jesse Banks was found dead, and the following officers were at the scene and responsible to ensure tier checks were performed:

   j. **Officer Praska**
   k. **Corporal D. Johnson**
   l. Officer H. Burghardt
   m. **Officer T. Banning**
   n. Officer N. Martin
   o. Officer B. Lohrman
   p. Officer D. Smith
   q. Officer J. McKinney
   r. Officer K. Van Houten
   s. Corporal B. Griffith
   t. Officer Alex Wagner

   *\*\*\*Bold Denotes Officers known to be at both scenes\*\*\**

41. Officers Praska, Officer Banning and Corporal D. Johnson were both present at both encounters. Each was present at the scene on the day of death and questioned by Detective Dunleavy.

PAGE 10    FOURTH AMENDED COMPLAINT

**WAYNE A. LAMB LAW, LLC**
183B High St. NE
Salem, OR 97301
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

42.     Each of the officers listed were personally responsible for tier checks on the day when Jesse Banks died, and each personally ignored their duties to perform tier checks on BHU on the night and/or morning that Mr. Banks died.

### 2. CIRCUMSTANCES OF DEATH

43.     Jesse Banks was found on his bunk on his stomach on April 1, 2023. His body was completely covered by his blanket.

44.     Mr. Banks's hands were positioned in a way that would not provide leverage for a person desiring to "hang" themselves.

45.     There are post-mortem factors that indicate that Jesse Banks died by strangulation, rather than by suicide.

46.     There were several facts that indicate that the death resulted from a killing, rather than suicide:

47.     **Dr. Millius pulled an N-95 mask from Jesse Banks' throat**, contrary to the Forensic Examination Report that suggests that the Medical Examiner did not know that there was an N-95 mask in the decedent's throat because it is entirely omitted from the report. Detective Dunleavy, however, specifically noted that he observed Dr. Millius pull the mask from Jesse Banks' throat.

   a. The blood stain on the mask is another marker ("reddish-brown" in color).

   b. Another marker is that the mask was ripped in half with one half of the mask rolled up and folded into the other half of the mask, and "stuffed" into the back of the mouth.

48.     **Jesse Banks' body position**: He was found with his his small state-issued blankets draped over his body, hidden from sight. Oregon State provides standard 6' blankets. Jesse Banks was 5'11". His hand was outstretch, extended straight over his head, which would make a foot-and-a-half of his body visible from the door. He could not be seen from the door in the way he was positioned, according to

**WAYNE A. LAMB LAW, LLC**
183B High St. NE
Salem, OR 97301
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

Officer Reports and according to answers provided to Detective Dunleavy.

    c. "he was found prone position with his hands under his torso." Yet, photographs show him in the fetal position with knees bent.

    d. However, Officer Martin stated in his report as follows: "As the blanket was further removed <u>I could see the hand of AIC banks was stuck in the stretched out position above his head and was purplish black</u>," right after Officer Martin said, "He is cold."

49. Two Blankets:

    e. Detective Dunleavy found two blankets outside the door of Jesse Banks' cell. One was torn and the other was not. Mr. Banks had a deprivation order for sheets and towels issued on 2/28/23 due to his incident on 2/23/23 when he tied the door shut.

50. Additionally, he was found on his stomach with his knees bent. His right arm was above his head, his left arm was slightly outstretched in a position indicating a triangle choke hold. However, the medical examiner, Rebecca Millius, stated in her report that he was found prone with his hands under his torso.

### 3. MEDICAL

51. Mr. Banks was found strangled in his cell. The autopsy shows that the strangulation was self-inflicted, but the autopsy relies on a flawed investigation because it was not provided the proper evidence to make its findings.

    f. The two major things ignored by the autopsy were: Jesse Banks was not found in the position that is written in the medical examiner report.

    g. There was an N-95 mask found in the throat of the decedent. It is unclear whether the medical examiner ever saw this mask.

52. Plaintiff will be able to point to exactly who was responsible for the death after discovery is produced to the Plaintiff. Plaintiff can establish the exact time of death based on the undissolved pills that were found in his stomach by the medical examiner,

**WAYNE A. LAMB LAW, LLC**
183B High St. NE
Salem, OR 97301
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

combined with video footage on the tier, and interviews or depositions.

53.     Dr. Huard's mental health notes from his interviews with Jesse Banks repeatedly shows that Jesse Banks was not suicidal, nor did he convey any ideas or thoughts of self-harm. The day before Jesse Banks' death, Dr. Huard noted that there were no suicidal thoughts or tendencies.

54.     Jesse Banks was under Dr. Huard's care for many months. Recently, Jesse Banks had been placed on involuntary medication.

55.     Dr. Pardilla was an as the outside provider contracted with ODOC to perform an independent analysis of the circumstances giving rise to involuntary medication. Dr. Pardilla is required to interview the patient for which involuntary medication will be prescribed, as well as witnesses. Dr. Pardilla did not visit the patient or interview witnesses. The tier was locked down for security concerns. There was no medical note stating that the medical department or any person sought to see Mr. Banks cell side, and Dr. Pardilla knew his medical opinion would be relied upon by the facility.

56.     Dr. Pardilla also stated that inmate did not "refuse medication because of a concern about side effects" and stated, "I do not see any mention of side effects."

57.     Jesse Banks clearly stated, and staff noted throughout the medical history, which was purportedly reviewed by Dr. Pardilla, that Mr. Banks was afraid of- or disliked- several side effects that Mr. Banks suffered from while in custody:
   i. "Dry mouth,"
   ii. "High heart rate,"
   iii. "Withdrawals,"
   iv. "Feeling shaky,"
   v. "Shakes" or "jimmies,"
   vi. "Sleeplessness,"
   vii. "Manic episodes,"
   viii. "Hypotensive episodes,"
   ix. "Nervous flinches,"
   x. "Fidgeting,"
   xi. "Dry mouth,"
   xii. "Stuffy nose,"

**WAYNE A. LAMB LAW, LLC**
183B High St. NE
Salem, OR 97301
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

    xiii.  "Dizziness for 6-12 months,"
    xiv.  "Twitching fingers,"
    xv.  "Blurry vision,"
    xvi.  "Hangover feeling,"
    xvii.  "Shaking,"
    xviii.  "Sedated,"
    xix.  "Tremors,"
    xx.  "Bouncing legs,"
    xxi.  "Side-effects from Holdol" requiring discontinuance,
    xxii.  "Akathisia,"
    xxiii.  "Agitation,"
    xxiv.  "Distress,"
    xxv.  "Restlessness,"
    xxvi.  "Loss of sleep,"
    xxvii.  "Afternoon sedation,"
    xxviii.  "Neck stiffness,"
    xxix.  "Sedation," and
    xxx.  "Nose bleeds,"
    xxxi.  and others.

58.    Jessica Rausin personally signed the form that notes "declined to sign" which was directly issued by Dr. Huard on 12/21/24, and initialed "no appeal" on the Administration of Involuntary Medications Appeal Process Review form.

59.    Any suicidal inclinations on the weeks leading up to the death were induced by involuntary increase of medication where Mr. Banks had previously attempted suicide upon being taken off of effective medication. Mr. Banks reported this during his mental health visits.

60.    On 12/13/2022, four months before Mr. Banks's death, Officer Duarte was working his assigned post as the Behavioral Health Unit (BHU) Officer on 2nd shift.

61.    At approximately 6:05am, he was on the top tier in Section 2 where Jesse Banks was housed, collecting trays from the morning meal.

62.    When Officer Duarte arrived at the cell front of BHU-34, solely occupied by Adult in Custody (AIC) Banks, Jesse (SID: 16045075), Officer Duarte opened the cuff port and asked Jesse Banks if he would hand him his tray.

63.    AIC Banks was sitting on his bunk and loudly stated "Who are you!" "What

PAGE 14    FOURTH AMENDED COMPLAINT

**WAYNE A. LAMB LAW, LLC**
183B High St. NE
Salem, OR 97301
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

is your name!"

64. Officer Duarte then asked Mr. Banks to hand him his tray and Mr. Banks drew his head backwards and spit at Officer Duarte from his bed.

65. Officer Duarte proceeded to file a complaint and sought disciplinary action.

66. While the action taken stated no punitive segregation action would be taken, Jesse Banks was ultimately placed into segregation, stripped of many necessities and basic luxuries provided to other AICs, and the event triggered steps within the facility to place Jesse on involuntary medication.

67. Jesse Banks was in a cell by himself without yard time, without the interaction with other inmates or people aside from yelling through his cell wall to his neighbors.

68. Dr. Huard noted, two weeks before the implementation of involuntary medication that Mr. Banks "is not willing to have a conversation about med risks and benefits. He received consistent med education during previous incarceration about risks/benefits." Dr. Huard also notes that "he denies thoughts of self-harm/suicide. Denies thoughts of harming others."

69. Dr. Huard notes that Mr. Banks was willing to take meds for depression and anxiety but not antipsychotics. There are several notes that Jesse Banks did talk about his symptoms, discussed his allergic reactions to certain medication, and how certain medications made him feel weird.

70. Dr. Huard was responsible for the medication regimen and oversaw the implementation of his orders and prescriptions, administration of medication, and she oversaw the nurses who distributed medication each individually participated in Mr. Banks's forced medication regimen.

71. Dr. Don Dravis was responsible for oversight on those same matters.

72. Ka Rin Johnson, LCSW, OMHP, was told by Jesse Banks that his mental health declined when his medications changed, which resulted in a manic episode and eventual relapse on substances. He personally informed her of the danger of drastic

PAGE 15    FOURTH AMENDED COMPLAINT

**WAYNE A. LAMB LAW, LLC**
183B High St. NE
Salem, OR 97301
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

medication changes, and she and Dr. Huard worked together to substantially and swiftly shift Jesse Banks' medication regimen. Jesse Banks even discussed a suicide attempt a few years prior with Ka Rin Johnson and Dr. Huard.

73. Dr. Huard knew, over several years of treating Mr. Banks, that Jesse Banks' had a habit of hiding his suicidal history and tendencies: Mr. Banks explains three suicide attempts in detail on 37 different pages of mental health notes. Those statements were mostly made while under her care. Yet, on another 29 pages, he directly denies those attempts or any desire to take his own life.

74. In 16 recorded conversations over the prior month leading up to Mr. Banks' death, he was showered with love, attention, and affection from his family. He spoke about the future, of work, of National Geographic subscriptions, and he generally spoke with optimism and level-headedness.

75. Jesse Banks had a mental ability to make his own medically informed decisions.

76. Jesse Banks died, either by his own hands, as the product of improper medication changes, improperly administered injections, and insufficiently sporadic tier checks during the short period leading up to his death, combined with bullying and abuse, or by the hands of the facility personnel.

77. Nurses Tabitha Drago, Emily Lill were the nurses who responded to the cell when the officers reported that there was an emergency in Jesse's cell that required medical assistance.

78. The active medical staff was responsible for inmate safety on the BHU. They did not perform their safety function to ensure tier checks were performed every 15 minutes of Jesse Banks, while he was at a heightened risk that they created.

79. K. Van Houten was the Corporal assigned to the Post as Mental Health Infirmary (MHI) Corporal, and he did not perform the requisite tier checks as required by rule in his role at the BHU or ensure that those tier checks were performed.

**WAYNE A. LAMB LAW, LLC**
183B High St. NE
Salem, OR 97301
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL LAW

80. Officer Wagner personally performed the tier checks, and personally failed to perform a number of tier checks during the relevant period leading up to Jesse Banks' death.

**Specifics of Tier Checks on the Night of Death**

81. Jesse Banks was on C-Unit Section 2 Up Stairs; he was checked on during the morning of 4/1/2023 as follows:

a. **Wagner, Alex: 12:06 a.m.**
**12:08 a.m.** tier check of C-Unit Section 2 Up Stairs
**12:44 a.m.** tier check of C-Unit Section 2 Up Stairs (36 minutes)
**1:21 a.m.** tier check of C-Unit Section 2 Up Stairs (37 minutes)
**1:58 a.m.** tier check of C-Unit Section 2 Up Stairs (37 minutes)
**2:35 a.m.** tier check of C-Unit Section 2 Up Stairs (37 minutes)
**3:12 a.m.** tier check of C-Unit Section 2 Up Stairs (37 minutes)
**3:52 a.m.** tier check of C-Unit Section 2 Up Stairs (40 minutes)
**4:34 a.m.** tier check of C-Unit Section 2 Up Stairs (42 minutes)

b. **Johnson, Dustin #462**
**6:11 a.m.** tier check of C-Unit Section 2 Up Stairs (**97 minutes**)
**6:51 a.m.** tier check of C-Unit Section 2 Up Stairs (40 minutes) [1]
**11:22 a.m.** tier check of C-Unit Section 2 Up Stairs (271 minutes or 4 hours and 31 minutes)

82. At 9:45 a.m., Ofc. Paul Wright and Ofc. Michael Praska served food to C-Unit Section 2 Up Stairs.

83. When they asked Mr. Banks if he wanted food. Ofc. Praska received no response from Banks. The two officers called for EMTs and Staff Assistance and a cut-down tool.

84. At 10:07 a.m. Banks pronounced dead.

85. There was a period from 4:34 to 6:11 a.m. (97 minutes or 1 hour and 37 minutes) where Mr. Banks was not checked.

86. There was a period from 6:51 a.m. to 9:45 a.m. (174 minutes or 2 hours and 54 minutes) where Mr. Banks was not checked.

---

[1] Jesse Banks was pronounced dead in between Corporal Dustin Johnson's tier checks at 6:51 a.m. and 11:22 a.m.

**WAYNE A. LAMB LAW, LLC**
183B High St. NE
Salem, OR 97301
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

87. There were two levels of failures with regard to tier checks.

88. Mr. Banks was on a mental health tier for these checks at SMU in the BHU.

89. Mr. Banks was surrounded by other mental health patients.

90. *Failure Number 1:* Each interval violates the OAR's policy of 15 minutes for Mental Health Patients with a risk of suicide.

91. Mr. Banks, for the reasons stated, was known to have attempted suicide after having his medications altered. This was directly communicated to mental health staff.

92. His medications were altered, and he was not placed on any type of security watch.

93. This violates the OARs for suicide risk tier checks.

94. *Failure Number 1:* Additionally, each of the intervals violates the OARs on 30 minute intervals for AICs in Solitary Confinement.

95. The guards, the staff, ODOC, and OSP failed to check on Jesse Banks at each and every 30-minute interval on the morning before he was found dead.

96. The staff did not check on Jesse Banks even one time within the prescribed 30-minute timeframe for the lesser requirement of Solitary Confinement.

97. The staff did not check on Jesse Banks even one time within the prescribed 15-minute timeframe for the lesser requirement of Solitary Confinement. The shortest interval tier check occurred at 12:44 a.m., which was 36 minutes.

**The SMU/BHU is Solitary Confinement**

98. The SMU/BHU operates as solitary confinement within the definition of the OARs.

99. The SMU/BHU operates as solitary confinement as a matter of practice.

100. This practice is known to Defendants.

101. In 2015, DOC entered into a plan to get inmates in BHU out of "solitary

PAGE 18    FOURTH AMENDED COMPLAINT

**WAYNE A. LAMB LAW, LLC**
183B High St. NE
Salem, OR 97301
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

confinement" in an agreement with DRO, where DOC signed a Memorandum of Understanding to make specific changes, which have still not been made or implemented, thereby making the SMU/BHU still a method of "solitary confinement."

4. OFFICERS' ACTIONS AND INACTION

102. All guards who were responsible for the AICs in BHU each knew that BHU was a "Behavioral Health Unit" which housed AICs with mental health problems and developmental disorders.

103. Over the previous several months, some of the named guards had encounters with Mr. Banks, including heckling and denying privileges that other inmates received.

104. Mr. Banks grieved against Officer Duarte and Wagner for ignoring him when it was time for his haircut.

105. Mr. Banks had written, "Duarte sucks dick for Tea Bags and Golden Tips" on his cell wall. He had complained to his mother of his food tasting like urine.

106. Mr. Banks grieved against Officer Johnson for ignoring him when he informed him that he was not a physical threat and was back to full restraints, even though his medical charts reflect the absence of physical threat or violence and reflect a mental health patient who had made substantial progress with conduct and communications, per the ODOC Behavioral Health Services Progress Note on 2/27/2023 by Ka Rin Johnson.

107. Mr. Banks Grieved against Officers "Kieth, Johnson, Teal, and 3 others" because the officers grabbed the ankle cuffs and handcuffs and yank them hard to "play head games" with him.

108. He informed the facility that "the MR is wrong; I don't have shower shoes; I got fed up being picked on by staff; I heard him; I tied the door shut."

109. The guards maced him in his cell on 1/14/23.

110. Guards who walked the tier on the night of his death are required to show

WAYNE A. LAMB LAW, LLC
183B High St. NE
Salem, OR 97301
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

that they performed a tier check by filling out a Behavioral Health Unit (BHU) Tier Patrol Log.

111. Officer Alex Wagner, Corporal Dustin Johnson (#462), and Officer Danny Smith (#348) checked the tier approximately every 36 minutes from midnight, until Jesse Banks' death. The policy of the facility is to check tier's every 30 minutes. They underperformed their 30-minute obligation with regard to checking on Mr. Banks by six minutes on average, or in other words, they performed 83% of their hourly obligation.

112. The policy of AICs with a high risk of suicide is every 15 minutes. Paliperidone is a medication used to treat schizophrenia, and a commonly known side effect of schizophrenia is suicidal thoughts, as well as depression. Two mental diseases that afflicted Mr. Banks.

113. Even with the appearance of 83% performance of their hourly obligation, officers, Wagner and Johnson, allowed 30 minutes to 40 minutes to pass for each tier check, and they allowed an additional 90-minute interval to pass and an interval of 174 minutes without a tier check on the behavioral health unit, during the hours leading up to the death. Those occurred while Mr. Banks was in a solitary cell on his BHU tier and while he was a high suicide risk (schizophrenic) and heavily modified doses of medication the week of his death. In other words, the guards failed on an average basis, and they failed egregiously during two points in time during the hours when Mr. Banks died.

114. Mr. Banks had his mental health medications changed substantially and frequently.

115. The medical records of Mr. Banks recent mental health treatment suggests that he was given a new extreme dose of the psychotropic drug, Paliperidone (Invega, oral; Invega Sustenna, Injection) on the eve of his death.

116. The records also show that he was given an additional dose of Paliperidone in the pill form on the night of his death. The autopsy by Dr. Millus shows

**WAYNE A. LAMB LAW, LLC**
183B High St. NE
Salem, OR 97301
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL LAW

there was two undissolved pills in his stomach.

117. The doctors and nurses previously named were in charge of those prescriptions and tier nurses were in charge of administration.

118. The Officers on the tier were charged with performing tier checks on the mentally ill AICs in BHU, including Jesse Banks at BHU34.

119. Officer Wagner went to Jesse Banks cell to deliver breakfast and Jesse did not answer. Officer Wagner ignored the fact that Jesse did not answer, and he moved on, ignoring OARs and prison policy.

120. Officer Wagner was the last person to attempt to make contact with Jesse Banks.

121. Officer Wagner was not interviewed by the Oregon State Police.

122. Officer Wagner left the scene of the death against Oregon policy, laws, and rules before he could be interviewed by the Oregon State Police , Detective Dunleavy, after Jesse Banks was found dead in his cell.

123. Jesse Banks was found blue, cold, and in rigor mortis, suggesting that he had died while Officer Wagner was on duty.

124. Alex Wagner performed Tier checks from 12:00 a.m. to 6:06 a.m.

125. Corporal Dustin Johnson performed the remaining tier checks from 6:06 a.m. until 9:45 a.m. when the body was found.

126. On 4/1/23, at approximately 9:45AM, Officer M. Praska was working as the Behavioral Health Unit Officer. Officer M. Praska was delivering lunch to BHU Section 2 on the top tier, which was where Jesse Banks (SID#16045075) was housed. Ofc. Praska asked Mr. Banks multiple times if he wanted his food. Mr. Banks did not respond to Officer Praska.

127. Officer Praska could see that Banks was laying on his bunk in a sleeping position. AIC Banks was completely covered by his blanket and his head was away from the cell door and positioned near rear wall.

PAGE 21    FOURTH AMENDED COMPLAINT

**WAYNE A. LAMB LAW, LLC**
183B High St. NE
Salem, OR 97301
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

128. Praska kicked the cell door to wake Mr. Banks. Mr. Banks did not respond. Officer Praska checked to see if Banks was breathing, but he could not tell from the cell door.

129. Officer Praska asked Corporal D. Johnson for his assistance.

130. Corporal D. Johnson and Officer H. Burghardt responded to the cell, and met Ofc Praska in front of Jesse's cell (BHU34).

131. Corporal D. Johnson and Officer M. Praska continued to yell Banks name to try and wake him up.

132. Neither Corporal D. Johnson nor Officer Praska could tell if Banks was breathing.

133. Officer H. Burghardt used her radio and notified Lieutenant P. Wright that a welfare check was need in BHU. Lieutenant P. Wright, Officer Banning and Officer N. Martin responded to the cell front of BHU34.

134. Once enough staff were present, the cell door was opened.

135. Officer Banning entered the cell with a Lexan shield for staff safety.

136. Officer Banning gently placed the shield on AIC Banks as a precautionary measure.

137. Officer N. Martin gained control of AIC Banks ankles.

138. Officer N. Martin stated that AIC Banks was cold. Staff then pulled the blanket away from Banks face.

139. Staff noticed that Banks face was purple, and he was not responsive. Officer Burghardt used her radio to initiate ICS.

140. Officer Burghardt requested additional staff and the AED.

141. Officer Banning noticed that AIC Banks had a piece of a state issued blanket wrapped tightly around his neck.

142. Officer Banning retrieved a cutdown tool. Together with Officer Praska, they removed the blanket from AIC Banks neck.

PAGE 22    FOURTH AMENDED COMPLAINT

**WAYNE A. LAMB LAW, LLC**
183B High St. NE
Salem, OR 97301
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

143. Medical staff responded to cell BHU34 and 911 was called by Master Control.

144. AIC Banks was move to his back and medical staff began giving CPR to AIC Banks.

145. Once the AED arrived AIC Banks was moved from the bed to the floor so staff could have a firm surface to continue CPR.

146. They stated that they did CPR, but they did not check the airway, which is one of the first things a medical professional performs upon performing CPR.

147. The AED was initiated, and it prompted Officer Banning to remove Banks' clothing to expose his bare chest.

148. Officer Banning used the cut down tool to cut the state issued clothing away from Banks' chest.

149. Once on the ground the AED pads were applied to Banks' chest while chest compressions were continually given.

150. The AED assessed AIC Banks and prompted staff not to touch Banks.

151. The AED did not advise shock to AIC Banks.

152. Medical and security staff continued to give CPR to AIC Banks until EMS arrived.

153. Some officers note that CPR was given.

154. Officers also allege that Jesse Banks' body had gone completely cold.

155. They stated he was purple and black from rigor mortis.

156. They stated that he was completely stiff and rigid from rigor mortis – so much rigidity that he was hard to move to the floor, yet it is claimed that they gave him CPR. Whether true or not, it was clearly too late, as Mr. Banks was pronounced dead at 10:07 a.m.

157. The cell door was secured with AIC Banks inside of cell BHU34. Lieutenant P. Wright designated cell BHU34 a crime scene.

PAGE 23    FOURTH AMENDED COMPLAINT

**WAYNE A. LAMB LAW, LLC**
183B High St. NE
Salem, OR 97301
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

158. Officer N. Martin was assigned to preserve the crime scene.

159. A Crime Scene Contamination Log was initiated and utilized. At approximately 11:53AM, the Oregon State Police, Marion County Medical Examiner and District Attorney responded to cell BHU34 to investigate the incident. At approximately 1:10PM, the State Police cleared the crime scene. The State Police case number for this incident is SP23093876.

160. Once the crime scene was clear AIC Banks' body was placed on a stretcher and was escorted to SMH Intake. At approximately 2:45PM Crown Memorial took possession of AIC Banks' body, and they transported him to the Oregon State Medical Examiner's Office in Oregon City. The SMH Building remained on modified lock down status due to low staffing and to give staff time to finish their paperwork. The staff who were involved in this incident did not report any injuries. All staff who were involved in this incident were afforded CISM. QMHP A. Myers conducted rounds in BHU to check welfare of the AIC's living in the Behavior Health Unit.

161. Jesse Banks had constant calls with his mother and grandma. They wrote back-and-forth. Mr. Banks also had a handful of other family members who he wrote back-and-forth.

162. Mr. Banks had plans to go to work with his uncle upon his release and to live with his uncle.

163. There were no notes or indications ~~showing~~ that Jesse Banks was suicidal found in Mr. Banks's cell.

164. There were sixteen calls of love and optimism in the final month of Jesse Banks' life, and there was only a portion of a call where Jesse was overly sad. He had Covid and was waiting to see the doctor, and he was afraid that he could die from it.

**OFFICERS AND AGENCIES**

165. ODOC has certain obligations to oversee its subsidiaries and various departments and to ensure compliance with state laws and rules and federal guidelines.

PAGE 24     FOURTH AMENDED COMPLAINT

**WAYNE A. LAMB LAW, LLC**
183B High St. NE
Salem, OR 97301
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

166. It is tasked to ensure correctional facilities and medical facilities within those correctional facilities adhere to its own policies and procedures to ensure they provide adequate medical care and mental health care as established by its own guidelines and as enacted by law.

167. Together, ODOC, OSP and its officers, COREY FHUERE, as Superintendent, and Dr. Huard, and Dr. Dravis were tasked with the following obligations:

h. Implement a guide for staff to conduct appropriate and thorough tier checks to ensure inmate safety;

i. Implement a guide for staff to conduct tier checks every 15 minutes as required by OAR 291-76-020 or even 30-minute increments as required by OAR 291-11-30; and

j. Implement a guide for staff to conduct cell searches as required by OAR 291-11-30.

**FIRST CLAIM FOR RELIEF**
**(Americans with Disabilities Act and § 504 of the Rehabilitation Act)**
ODOC & OSP

168. Plaintiff realleges paragraphs 1-146 and incorporates herein.

169. The prisons comprising of the Oregon Department of Corrections have been recipients of federal funds and are thus covered by § 504's mandate, which requires recipients of federal money to reasonably accommodate disabled persons within their facilities, program activities, and services, and reasonably modify such facilities, services, and programs to accomplish the intended purpose of the act. For the 2021-23 budget, ODOC received $2.2 billion dollars, and $2.3 billion dollars have been allocated for the 2023-25 adopted budget, including allocation of federal funds for this purpose.

170. The prisons comprising of the Oregon Department of Corrections are

PAGE 25    FOURTH AMENDED COMPLAINT

**WAYNE A. LAMB LAW, LLC**
183B High St. NE
Salem, OR 97301
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

public entities within the meaning of Title II of the ADA, and provide programs, services or activities to the general public. In its essence, Title II of the ADA is the same mandate as Section 504.

171. At all times relevant to this action, Mr. Banks was a qualified individual within the meaning of Title II of the ADA. He met the requirements for eligibility and the receipt of the services, programs, or activities of ODOC. Specifically, Mr. Banks suffered from a mental impairment that "substantially limits one or more major life activities," including but not limited to "learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. §12102.

172. The Oregon Department of Corrections provides housing, medical and mental health treatment, and work and educational programs to prisoners, which comprise programs and services for Section 504 and Title II purposes.

173. Under the ADA, the Oregon Department of Corrections is required to ensure that developmentally disabled prisoners are properly identified in order to provide reasonable accommodations to those prisoners. Therefore, under the ADA, a tracking system is necessary to ensure that these disabled prisoners are properly identified.

174. Mr. Corey Fhuere, as the superintendent, is responsible for oversight within the facility to ensure compliance with federal and state disability laws.

175. Mr. Banks was under the care of Dr. Bernadette Huard, who was responsible for diagnosing and treating his mental disorders. Dr. Huard altered Mr. Banks's medication, ignored the need for continuous observation, and failed to perform necessary checks, which are critical components of providing adequate mental health care. These actions demonstrate a failure to provide reasonable accommodation and adequate medical care, which are essential functions under the ADA.

176. Dr. Don Dravis, as the Chief Psychiatrist for ODOC, had clinical oversight of behavioral health prescribers and was responsible for providing medical and clinical

**WAYNE A. LAMB LAW, LLC**
183B High St. NE
Salem, OR 97301
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL LAW

leadership. His failure to ensure that Dr. Huard and other medical staff followed proper procedures and provided adequate care further supports the claim of discrimination and denial of benefits under the ADA and 504.

177. Nurses Ka Rin Johnson and Jessica Rausin participated in mental health evaluation of Mr. Banks and participated in his involuntary medication. Each knew of Mr. Banks prior suicidal attempts.

178. Mr. Banks reported to "Jessica Haynes", now Jessica Rausin that he was experiencing suicidal ideation. He reported in a suicide smock, and she specifically noted that "He appears to be an unreliable reporter due to … misinformation provided regarding past suicide attempts. She specifically notes several prior suicide attempts.

179. Mr. Banks was placed on suicide close observation many times.

180. Under the ADA, the State may not exclude an individual from participation in or be denied benefits of the public entity's services, programs, or activities, or otherwise face discrimination from the public entity by reason of their disability. Alphonsis v. Century Reg'l Det. Facility, 2017 U.S. Dist. LEXIS 228013, Beadle v. Smolich, 2022 U.S. Dist. LEXIS 102558, Stuckey v. California, 2020 U.S. Dist. LEXIS 36641.

181. In the context of prisons, this means that mental health patients must be provided with the same access to services, programs, and activities as other inmates. This includes making reasonable modifications to policies, practices, or procedures when necessary to avoid discrimination, unless such modifications would fundamentally alter the nature of the service, program, or activity. *Bozeman v. Santoro, No. 1:17-cv-01247-DAD-GSA-PC, 2018 US Dist LEXIS 122861 (ED Cal July 23, 2018); Alphonsis v. Century Reg'l Det. Facility*, No. CV 17-03650-ODW (DFM), 2017 US Dist LEXIS 228013, at *30 (CD Cal Sep. 11, 2017); *Beadle v. Smolich*, No. 2:22-CV-515-JCC-DWC, 2022 US Dist LEXIS 102558, at *5 (WD Wash June 8, 2022).

182. The Oregon Department of Corrections was deliberately indifferent in

**WAYNE A. LAMB LAW, LLC**
183B High St. NE
Salem, OR 97301
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

failing to provide Mr. Banks with reasonable accommodations and other services related to his disabilities, and denied him the rights and benefits afforded to other inmates, solely by reason of his disabilities in violation of the ADA and Rehabilitation Act in the following particulars:

a. The Oregon Department of Corrections is required to provide staff assistants to developmentally disabled prisoners in disciplinary proceedings, and also must ensure that those staff assistants or providing the prisoners with effective communication. Mr. Banks received no such accommodation.

b. The ADA and Rehabilitation Act require that prison staff try to counsel developmentally disabled prisoners rather than subjecting them to the disciplinary process when they break prison rules that they do not understand. Mr. Banks received no such accommodation.

c. The ADA and Rehabilitation Act require that developmentally disabled prisoners have access to adequate medical and mental health care. Mr. Banks was denied adequate mental health treatment.

d. The ADA and Rehabilitation Act require that developmentally disabled prisoners have access to ODOC programs, services, activities, work and educational opportunities. Mr. Banks received no such accommodation. Because he spent the vast amount of his incarceration at OSP in the BHU, he was denied virtually all programs, services, and activities available to the prisoners, e.g., exercise, yard time, games, television, socialization, job programs, educational opportunities, etc.

e. He was denied haircuts and actual responsiveness to his grievances and complaints. Instead, he was largely ignored whenever he voiced a concern or complaint, even when it related to his being allergic to a

PAGE 28    FOURTH AMENDED COMPLAINT

**WAYNE A. LAMB LAW, LLC**
183B High St. NE
Salem, OR 97301
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

particular drug or when it related to the pain of his handcuffs and ankle cuffs.

f.  He was denied the appropriate protective supervision that would avoid self-harm on the night of his death when the facility, medical staff, and officer tasked to escort those persons knew of the drastically changed medication and treatment and failed to protect the inmate by following its own safety precautions through 15-minute tier checks for high risk individuals and/or 30-minute tier checks for adults in segregation.

g.  Mr. Banks was placed in solitary confinement for extended periods despite clear administrative orders rejecting solitary confinement for punishment against people with developmental disorders.

h.  Mr. Banks was deprived of necessities that other inmates enjoyed like exercise and phone privileges, as well as his paperwork and writing items, so he was cut off from his friends and family at certain points in time by the facility's abusive measures.

i.  Nothing was ever effectively communicated to him regarding what was required of him to obtain a better standing and security rating in the facility so that he could get out of segregation, out of trouble and into a better custodial living situation.

j.  He was maced in his cell by Officer Ruiz when he locked himself in his cell to stop what Mr. Banks believed to be abusive measures taken by guards.

k.  He was bruised badly on his hands and ankles by excessive force placed on to handcuffs and ankle cuffs that were too tight and that he had communicated were too tight and painful.

l.  He was picked on repeatedly for his mental disorder, and State of Oregon, ODOC, OSP, and the administrators and managers failed to

**WAYNE A. LAMB LAW, LLC**
183B High St. NE
Salem, OR 97301
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

train its officers on mental health disorder management.

183.   The Oregon Department of Corrections failed to enforce appropriate policies and procedures to ensure the provision of necessary accommodations, modifications, and/or services to inmates with developmental disabilities.

184.   The Oregon Department of Corrections and its Officers failed to train and supervise the prison personnel to provide necessary accommodations, modifications, services and or physical access to inmates with developmental disabilities.

185.   As a direct and proximate result of ODOC's foregoing wrongful acts, Defendant State of Oregon discriminated against Mr. Banks on the basis of his disability in violation of the Americans with Disabilities Act and Rehabilitation Act, causing him to suffer severe emotional distress and causing his eventual death during his incarceration at the Oregon Department of Corrections.

186.   Accordingly, Plaintiff, individually and as the personal representative of the estate of Jesse Banks, is entitled to economic and non-economic damages in an amount to be determined at trial against Defendant State of Oregon for the violations of 42 U.S.C. § 12101 et seq., § 504 of the Rehabilitation Act, and for plaintiff's attorney fees and costs pursuant to 29 USC § 794a(b) and 42 U.S.C. §§ 12205 and 1988.

### SECOND CLAIM FOR RELIEF
### (Civil Rights 42 USC § 1983 DITSMN)
#### MEDICAL STAFF

187.   Plaintiff realleges paragraphs 1-160, and specifically as follows:
   a. **Dr. Huard.** ¶154.
   b. **Nurse Ka Rin Johnson.** ¶156.
   c. **Nurse Jessica Rausin.** ¶157.

188.   Defendant Dr. Huard and Nurse Ka Rin Johnson were deliberately indifferent to Mr. Banks serious psychiatric needs as follows:
   a. In failing to diagnose Mr. Banks's mental disorders and diseases, but rather issuing broad reviews of regurgitated material from prior medical notes; medical staff ignored his logical responses and statements

**WAYNE A. LAMB LAW, LLC**
183B High St. NE
Salem, OR 97301
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

about his allergic reactions to drugs and his fear in taking certain drugs due to previous physical reactions;

b. In failing to treat Mr. Banks's mental disorders and diseases;

c. In failing to read Mr. Banks's inmate file which indicated that he suffered from a developmental disability and had been previously treated and found competent to stand trial only months prior to the involuntary medication plan;

d. In failing to provide Mr. Banks with adequate mental health care;

e. In failing to properly assess Mr. Banks for suicidal or self-injury tendencies;

f. In failing to communicate those dangers, if known, to jail staff responsible for performing tier checks throughout the day on the BHU Tier.

g. In failing to follow ODOC's suicide prevention policy; and

h. In failing to follow up with Mr. Banks after issuing a drastic psychotropic change that carried serious dangers of suicide, and that would amount to an overdose in normal persons.

i. In failing to provide a true and accurate police report surrounding the circumstances of his death.

189. Plaintiff specifically realleges paragraphs 10, 13, 62-65, 78, and 91 and incorporates herein applied to Ka Rin Johnson and Jessica Rausin.

190. Defendants Ka Rin Johnson and Jessica Rausin, were under Dr. Huard's and Dr. Dravis's supervision.

191. Each were independently deliberately indifferent to Mr. Bank's serious psychiatric needs: Nurses Johnson and Rausin and Dr. Huard, directly, and Doctors Huard and Dravis as supervisors and for failure to train in the following:

a. In practicing psychology without a license (Nurses Johnson and

**WAYNE A. LAMB LAW, LLC**
183B High St. NE
Salem, OR 97301
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

Rausin);

b.  In failing to read the inmate file that indicated that Mr. Banks suffered from a developmental disability, had altered medications, and had a substantial history with allergic reactions to certain prescription medications that resulted in manic episodes and previous suicide attempts;

c.  In failing to diagnose Mr. Banks's mental disorders and diseases;

d.  In failure to observe previously diagnosed disorders and diseases (schizophrenia and depression);

e.  In failing to provide Mr. Banks with adequate mental health care;

f.  In failing to have a qualified mental health professional assess Mr. Banks after he informed them that he had self-harmed in the past with changed medications;

g.  In failing to treat Mr. Banks's mental disorders and diseases;

h.  In failing to properly assess Mr. Banks's for suicidal or self-injury tendencies;

i.  In failing to follow ODOC's suicide prevention policy;

j.  In allowing Mr. Banks to remain in isolation in disciplinary segregation under the guise of "Behavioral Health Unit," while he was still at risk for suicide and without consistent observation or tier checks;

k.  In failing to provide any follow-up whatsoever after Mr. Banks made statements of self-harm;

l.  In failing to follow up with Mr. Banks after he displayed changing moods, which was noted as a concern over the preceding month that Mr. Banks had acted out of character; and

m.  In failing to make sure that Mr. Banks was moved to a higher visibility cell after switching his involuntary medication to a substantially

**WAYNE A. LAMB LAW, LLC**
183B High St. NE
Salem, OR 97301
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

stronger and substantially higher dose:

1. **On 3/16/23:** his Invega medication was increased to 12 mg hs.
2. **On 3/22/23:** his medication became an Injectable Invega Sustenna, receiving first dose of 234 mg IM on 3/27/23.

n. Along with Defendants Dr. Don Dravis, Dr. Huard by ignoring the prescription and failing to install important medical protocols for involuntary medication plans and causing an overdose when Mr. Banks received 234 mg IM, while taking his increased oral dose of 12 mg.

192. Bernadette Huard participated in the deprivation, individually, and Plaintiff realleges paragraph 154 and incorporates herein.

193. As the mental health specialist, she played a particularized role to ensure that the facility and staff were aware of the decedent's mental health afflictions to ensure the appropriate protective measures were implemented for the protection of the inmate.

a. Dr. Huard's actions, including administering an additional dose of Invega that may have triggered a suicide, failing to diagnose and treat Mr. Banks's mental disorders, and ignoring his statements about allergic reactions and fear of certain drugs, indicate deliberate indifference to Mr. Banks's serious psychiatric needs.

b. Dr. Don Dravis, as the Chief Psychiatrist for ODOC, had clinical oversight of behavioral health prescribers and was responsible for providing medical and clinical leadership. His failure to ensure that Dr. Huard and other medical staff followed proper procedures and provided adequate care further supports the claim of deliberate indifference to the serious medical needs of Jesse Banks.

c. Together, Dr. Huard and Dr. Dravis ignored the tracking system needs and requirements, which are necessary for the safety and protection of

PAGE 33    FOURTH AMENDED COMPLAINT

**WAYNE A. LAMB LAW, LLC**
183B High St. NE
Salem, OR 97301
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

mentally ill prisoners with high suicide risks and risks associated with extended detention in solitary isolation.

d. Nurses Ka Rin Johnson and Jessica Rausin participated in mental health evaluation of Mr. Banks and participated in his involuntary medication. Each knew of Mr. Banks prior suicidal attempts.

e. As the senior medical person, the doctor, overseeing the nurses' work, Dr. Huard knew or should have known the same.

f. Mr. Banks reported to "Jessica Haynes", now Jessica Rausin that he was experiencing suicidal ideation. He reported in a suicide smock, and she specifically noted that "He appears to be an unreliable reporter due to … misinformation provided regarding past suicide attempts. She specifically notes several prior suicide attempts.

g. As the senior medical person, the doctor, overseeing the nurses' work, Dr. Huard knew or should have known the same.

h. Mr. Banks was placed on suicide close observation many times.

i. The Oregon Department of Corrections, and each of the named Defendants identified above, (a) knew through its tracking system, (b) knew through the mental health policies and (c) knew through the progress notes, and (d) knew through Mr. Banks's placement in BHU that Mr. Banks suffered from a developmental mental health disorder. It was well documented that he suffered from Schizophrenia, as well as depression and anxiety.

194. Dr. Huard knew that he had communicated his desire to stay off of particular medications because they made him sick; he had allergic reactions to certain medications, and Dr. Huard rejected his words. The nurses and staff relied upon Dr. Huard's findings to make important choices to deprive Mr. Banks of liberties, which ultimately deprived him of his life.

PAGE 34 FOURTH AMENDED COMPLAINT

**WAYNE A. LAMB LAW, LLC**
183B High St. NE
Salem, OR 97301
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

195. When it came to medication, Dr. Huard effectively said, Jesse Banks was not okay to make informed choices and advised involuntary medication. She simultaneously determined that Jesse Banks did not need continuous observation to ensure he was not a danger to himself and additionally allowed Mr. Banks to make the decision to reject an outside opinion for involuntary medication.

196. Dr. Dravis participated in the deprivation, individually and as a supervisor, as head of psychiatry effectively stamped the same as head of the Department. Plaintiff realleges paragraph 155 and incorporates herein.

197. Dr. Dravis had access and was personally responsible to ensure the review of medical files, mental health treatment of incoming prisoners, and medical history and mental history of incoming prisoners.

198. He further had a duty to oversee Dr. Huard's work to ensure that she was providing the mental health patient with appropriate care and treatment, as well as ensuring the appropriate protocols and protections were implemented to protect the inmate from involuntary medical treatment.

199. Dr. Dravis ignored his duty to the inmate by refusing to enforce the "outside provider" requirement was met.

200. Together, Dr. Huard and Dr. Dravis intentionally ignored their respective duties to the mental health patient, and they ignored the patient's desires, which ultimately resulted in medication that caused the patient to suffer needless and unwanted pain and suffering.

201. Additionally, Dr. Huard and Dr. Dravis, allowed nurse practitioners, Ka Rin Johnson, Jessica Rausin, Arma Ybarra, and Tabitha Drago, to perform the duties of a doctor and ignored their duties to review the nurse's findings.

202. He was recently found competent to stand trial, but not competent to make informed medical decisions. He was found competent to make his own decision to reject Dr. Pardilla's review, and he was found competent to no need continual observation.

**WAYNE A. LAMB LAW, LLC**
183B High St. NE
Salem, OR 97301
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

203. In sum, the medical staff found him "competent" when convenient for their facility purposes and "incompetent" when inconvenient for their facility purposes.

204. As a result of Defendants Huard, Dr. Dravis, and Ka Rin Johnson's deliberate indifference, the Defendants violated Mr. Banks's right to be free from cruel and unusual punishment under the Eighth Amendment of the United States Constitution.

205. Each of them individually intentionally ignored their individual duties, and due to their inconsistent implementation of procedures, Mr. Banks was overdosed with psychotropic medication.

206. In addition, and connection to that inconsistent implementation of procedures, Mr. Banks was placed into an unpredictable mental state by medical staff and medical staff ignored the implementation of safeguards.

207. The medical staff, including Dr. Huard, Ka Rin Johnson, and Dr. Don Dravis, had a duty to communicate the need for protective measures on individuals for the mental health patient to DOC officers, including 15-minute tier checks. They each ignored that duty.

208. They each, directly, rejected their duties to protect Mr. Banks by failing to ensure mental health patients had consistent tier checks.

209. Jesse Banks was found several hours after he died, purple, blue, and in full rigor, which shows that he was not just neglected, but grossly ignored despite his mental condition.

210. Dr. Huard's, Ka Rin Johnson's, and Dr. Dravis's grossly reckless medical care violated Mr. Bank's Constitutional rights, when they ignored Jesse Banks' medical desires and his medical needs.

211. As a result, Mr. Banks suffered the loss of life, and severe physical and mental pain, and suffering leading up to his death.

212. Jesse Banks' mother suffered the loss of her son, and accordingly, plaintiff

PAGE 36    FOURTH AMENDED COMPLAINT

**WAYNE A. LAMB LAW, LLC**
183B High St. NE
Salem, OR 97301
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

Patricia Nemeth, individually and as the personal representative of the Estate of Jesse Banks, is entitled to economic and non-economic damages against Defendants Dr. Don Dravis, D. Bernadette Huard, Ka Rin Johnson, and Jessica Rausin, in an amount to be determined at trial for the violations of 42 U.S.C § 1983 and for plaintiff's attorney fees and costs pursuant to 42 U.S.C. § 1988.

## THIRD CLAIM FOR RELIEF
### (Civil Rights 42 USC § 1983 – Failure to Protect)
MEDICAL STAFF: DR. HUARD, RN JOHNSON, RN RAUSIN;
OFFICERS: OFC. WAGNER AND OFC. JOHNSON

213. Plaintiff realleges paragraphs 1-165 and realleges the same against ODOC and OSP, and specifically identifies as follows:
   a. **Dr. Bernadette Huard.** ¶154.
   b. **Nurse Ka Rin Johnson.** ¶156.
   c. **Nurse Jessica Rausin.** ¶157.
   d. **Officer Alex Wagner.** ¶ 44-57, 67-72, 85-128, and 142-144.
   e. **Officer Dustin Johnson.** *Id.*

214. Dr. Huard, Dr. Dravis, Nurse Ka Rin Johnson, Jessica Rausin, and Corey Fhuere, specifically failed to inform officers of the serious need for consistent tier checks.

215. Ka Rin Johnson specifically failed to inform officers of the serious need for consistent tier checks.

216. Jessica Rausin specifically failed to inform of the serious need for consistent tier checks.

217. Plaintiff realleges against named officers, paragraphs 44-57, 67-72, 85-128, and 142-144.

218. Plaintiff alleges Defendants Officer Alex Wagner and Corporal Dustin Johnson were deliberately indifferent to a substantial risk of serious harm to plaintiff. Each had a duty on the tier to ensure tier checks were performed, and further:
   a. By failing to conduct appropriate and thorough tier checks;
   b. By failing to conduct tier checks every 15 minutes as required by OAR

PAGE 37    FOURTH AMENDED COMPLAINT

**WAYNE A. LAMB LAW, LLC**
183B High St. NE
Salem, OR 97301
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

291-76-020 or even 30-minute increments as required by OAR 291-11-30;

c. By failing to conduct cell searches as required by OAR 291-11-30.

d. Specifically, Officer Wagner ignored Jesse Banks, only checking on him every 36-42 minutes and allowing 97 minutes to elapse without him being checked on. He ignored Jesse Banks for Breakfast around 5:30 a.m. when Jesse did not respond, and he did not bother to check him for signs of life;

e. Officer Johnson took over the duty from Officer Wagner, and did not bother to check on Banks for 90 minutes and 174 minutes, while Mr. Banks was on a mental health watch before he was found dead. So much time elapsed between tier checks that rigor mortis had set in, and Mr. Banks was blue and cold to the touch before anyone realized he was dead.

f. Banks grieved against the officers a month prior;

g. He was given a significant new dose of medication, which enhanced their requirement to tier checks, due to the nature of psychotropic medication and their side effects; and

h. Mr. Banks was left in solitary confinement in the BHU, while he was at high risk of suicide, and he was left unattended and ignored while simultaneously given a significantly higher doses of medication. [2]

219. Officer Wagner and Corporal Johnson were deliberately indifferent for failing to perform requisite tier checks on the BHU.

220. Defendants Dr. Huard, Dr. Dravis, Ka Rin Johnson, Arma Ybarra, and Jessica Rausin, and were deliberately indifferent by failing to perform or ensuring

---

[2] Solitary or single cell solely occupied by Mr. Banks without opportunities to leave his cell and go onto the yard or interact with other people. Some specifics require additional discovery.

**WAYNE A. LAMB LAW, LLC**
183B High St. NE
Salem, OR 97301
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

performance of tier checks on a prisoner with heightened suicidal conditions. Specifically, they failed to perform tier checks when Defendants knew Mr. Banks suffered from schizophrenia and depression both having known suicidal risks;

221. Further, the failure was during a point in time where the medical team altered Mr. Banks meds which heightened the suicide risk further, as Mr. Banks had previously informed them that altered medication caused him to become suicidal in the past.

222. The Defendants violated Mr. Banks's right to be free from cruel and unusual punishment under the Eighth Amendment of the United States Constitution.

223. Officer Wagner and Corporal Johnson were both present and responsible for Mr. Banks safety on the day that Mr. Banks died.

224. Both were tasked to perform tier checks on the day Mr. Banks died. Both failed to perform the requisite check required under the OARs.

225. Defendants' conduct caused Mr. Banks to suffer the loss of life, and severe mental pain, physical pain, and suffering. Accordingly, Plaintiff, Patricia Nemeth, individually and as the personal representative of the Estate of Jesse Banks, is entitled to economic and non-economic damages against the named herein, Defendants, **medical personnel** responsible for facilitating and performing tier checks: Dr. Bernadette Huard, Ka Rin Johnson, and Jessica Rausin, and

226. Plaintiff is entitled to the same against **Officer Wagner and Corporal Johnson for failing to perform** tier checks on the tier where Mr. Banks was housed in the BHU on the date of Banks' death.

227. Plaintiff asserts against medical staff and correctional officers who failed to ensure the inmate's safety, in an amount to be determined at trial for the violations of 42 U.S.C § 1983 and for plaintiff's attorney fees and costs pursuant to 42 U.S.C. § 1988.

**FOURTH CLAIM FOR RELIEF**
**(Civil Rights 42 USC § 1983)**
SUPERINTENDENT

**WAYNE A. LAMB LAW, LLC**
183B High St. NE
Salem, OR 97301
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

228. Plaintiff realleges paragraphs 1-169 as incorporated herein, and specifically identifies as follows:

    a. **Superintendent Fhuere. ¶158.**

229. As the Superintendent of OSP, Defendant Fhuere, has the following responsibilities:

    a. To keep prisoners in safe custody under humane conditions;

    b. Provide for public safety by managing the institution so as to maintain control and custody of inmates;

    c. To direct and/or coordinate all institution staff in providing counseling, psychological, and psychiatric services for inmates;

    d. Supervise all institution personnel management practices, including hiring, disciplinary action, layoffs and termination;

    e. Continuously monitor and keep informed of all applicable federal and state laws, Administrative Rules, and Regulations;

    f. Ensure that legal rights of inmates are protected by maintaining knowledge of applicable law, and by developing and implementing institution policies in conformity with the law;

    g. Implement and monitor compliance with all ODOC/institution rules, policies and procedures; and

    h. Ensure accurate reporting and accuracy in the investigation of prison deaths.

230. Defendant Fhuere was deliberately indifferent to Mr. Banks's health and safety as follows:

    a. In failing to monitor and review the electronic logs indicating the frequency of tier checks in the BHU;

    b. In failing to ensure that the correctional officers were performing thorough tier checks;

PAGE 40    FOURTH AMENDED COMPLAINT

**WAYNE A. LAMB LAW, LLC**
183B High St. NE
Salem, OR 97301
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

c. In failing to implement and/or monitor compliance with OAR 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 which requires that every inmate in disciplinary segregation status be checked at least once every 30 minutes;

d. In failing to implement and/or monitor compliance with OAR 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 which requires that every inmate with a suicide risk be checked at least once every 15 minutes;

e. In failing to implement and/or monitor compliance with OAR 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 which requires that each disciplinary segregated inmate be visited daily by a member of medical staff;

f. In failing to implement and/or monitor compliance with OAR 291-76-020 which requires close observation after demonstration of suicide warning signs;

g. In failing to implement and/or monitor compliance with OAR 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 which requires strict requirements to be met to Obtain Informed Consent for Administration of Psychotropic Medications;

h. In allowing unqualified and unlicensed persons, including Ka Rin Johnson and Jessica Rausin and Arma Ybarra, to provide mental health services to high-risk inmates such as Mr. Banks;

i. In allowing an environment where illegal drug administration, and poor drug administration procedures are used and is tolerated;

j. In failing to monitor when forced medication injections are done, subjecting a person to multiple and unnecessary injections, including Mr. Banks;

k. In failing to conduct internal investigations and training of inmate deaths to ascertain the prison's failures in preventing inmate deaths;

231. Defendant Fhuere knew or should have known that his subordinates were not following or adhering to Oregon the Administrative Rules, and ODOC Policies and

PAGE 41    FOURTH AMENDED COMPLAINT

**WAYNE A. LAMB LAW, LLC**
183B High St. NE
Salem, OR 97301
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

Procedures, and that such failure would result in a serious risk of injury or death to inmates such as Mr. Banks.

232. Defendant Fhuere knew or should have known that the medical personnel and staff were tasked to implement involuntary drug administration on persons with developmental disabilities in the BHU, and that failing to monitor such an operation would result in a serious risk of injury or death to inmates such as Mr. Banks.

233. As a result of Defendant Fhuere's deliberate indifference, the OSP personnel violated Mr. Banks's right to be free from cruel and unusual punishment under the Eighth Amendment of the United States Constitution.

234. Acting complicitly, Dr. Millius produced a dishonest report of Mr. Banks's death, which is a significant factor in ensuring the appropriate safeguards are put into place on in-custody deaths. By falsifying or misreporting, as a representative for the State of Oregon, she intentionally disregarded the serious medical need of Mr. Banks to have a true and accurate medical report, so that a complete investigation could be formed by the district attorney's office in Marion County.

235. Dr. Millius produced an inaccurate report of Mr. Banks's death, which significantly impacted the investigation and the determination of the cause of death.

236. The Plaintiff claims that Dr. Millius disregarded critical evidence, such as the presence of a bloody N-95 mask in Mr. Banks's mouth, which was not mentioned in her autopsy report.

237. This omission contributed to a potentially false determination of suicide rather than murder.

238. These actions are connected to the violation of Mr. Banks's Constitutional rights, resulting in severe mental and physical suffering for Mr. Banks and emotional distress for his mother.

239. As a result of Defendant's, Corey Fhuere's, violation of Mr. Bank's Constitutional rights, Mr. Banks suffered the loss of life, and severe mental pain,

**WAYNE A. LAMB LAW, LLC**
183B High St. NE
Salem, OR 97301
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

physical pain, false publications of suicide, and other suffering, and Jesse Banks'

mother had to suffer needless suffering upon hearing that information, and then again

finding that wrongdoing was done to him through her own investigations. Accordingly,

plaintiff Patricia Nemeth, individually and as the personal representative of the Estate of

Jesse Banks, is entitled to economic and non-economic damages against Defendants

named herein, in an amount to be determined at trial for the violations of 42 U.S.C §

1983 and for plaintiff's attorney fees and costs pursuant to 42 U.S.C. § 1988.

### FIFTH CLAIM FOR RELIEF
### (Civil Rights 42 USC § 1983)
CHIEF OF PSYCHIATRY
*OFFICIAL/SUPERVISORY CAPACITY[3]*

240.    Plaintiff realleges paragraphs 1-177, and specifically identifies as follows:

    a.  **Dr. Don Dravis,** ¶1-7, 12, 73-77, and 150-152.

241.    As the Chief of Psychiatry at ODOC and/or OSP, Defendant Dr. Don

Dravis was responsible for ensuring his staff complied with Policy and Procedure as

listed in paragraphs 150-152.

242.    Defendant Dr. Don Dravis was deliberately indifferent to Mr. Banks's

health and safety by failing to ensure his staff's compliance with Policy and Procedures

and OARs listed in claims I-IV.

243.    Defendant Dr. Don Dravis knew or should have known that his staff was

not following or adhering to ODOC Policy and Procedures, and that such failure would

result in a serious risk of injury or death to inmates such as Mr. Banks.

244.    Defendant Dr. Don Dravis knew or should have known that the health care

workers were not tracking their involuntary medication doses appropriately on a single

form for careful tracking, and that tolerating this conduct would result in a serious risk of

injury or death to inmates such as Mr. Banks.

245.    As a result of Defendant Dr. Don Dravis's deliberate indifference, the OSP

---

[3] Amended claim to reflect Official Capacity for Dr. Don Dravis on this claim.

**WAYNE A. LAMB LAW, LLC**
183B High St. NE
Salem, OR 97301
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW

health care staff violated Mr. Banks's right to be free from cruel and unusual punishment under the Eighth Amendment of the United States Constitution.

246. As a result of Defendant Dr. Don Dravis's violation of Mr. Banks's Constitutional rights, Mr. Banks suffered the loss of life, and severe mental pain, physical pain, and suffering. Accordingly, plaintiff Patricia Nemeth, individually and as the personal representative of the Estate of Jesse Banks, is entitled to economic and non-economic damages against Defendant Dravis in an amount to be determined at trial for the violations of 42 U.S.C § 1983 and for plaintiff's attorney fees and costs pursuant to 42 U.S.C. § 1988.

**WHEREFORE**, plaintiff prays for relief as follows:

a. For judgment in favor of plaintiff, The Estate of Jesse Banks against Defendants for his economic and noneconomic damages in the amount of $20,000,000 or other reasonable amount to be proven at trial;

b. For judgment in favor of plaintiff, Trish Nemeth, against Defendants for her economic and noneconomic damage for a reasonable amount to be proven at trial;

c. For a judgment in favor of plaintiffs against Defendants for punitive damages; and

d. For reasonable attorneys' fees and costs pursuant to 29 USC § 794a and 42 U.S.C. §§ 1988 and 12205; and

e. For such other and further relief as may appear just and appropriate.

DATED: Friday, August 23, 2024.     **WAYNE A LAMB – LAW**

By:___/s/ Wayne Lamb____
　Wayne Lamb, OSB#211908
　wayne@wlamblaw.com
　Of Attorneys for Plaintiff

**WAYNE A. LAMB LAW, LLC**
183B High St. NE
Salem, OR 97301
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL LAW

# CERTIFICATE OF SERVICE

I hereby certify that on MONDAY, DECEMBER 29, 2025, I served a true and complete copy of FOURTH AMENDED COMPLAINTsupporting the motion on the named individual(s) below by the method indicated as follows:

**NATHANIEL AGGREY #172283**
*Assistant Attorney General*
*Department of Justice*
1162 Court Street NE
Salem, OR 97301-4096
Telephone: (503) 947-4700
Fax: (503) 947-4791
Nathaniel.Aggrey@doj.oregon.gov
*Attorney for State Defendants*

☐ HAND DELIVERY
☐ MAIL DELIVERY
☐ OVERNIGHT MAIL
☐ TELECOPY (FAX)
☒ EMAIL
☒ E-SERVED

**RAMON HENDERSON**
*Hodgkinson Street Mepham, LLC*
1620 SW Taylor St, Suite 350
Portland OR 97205
(503) 222-1143
(503) 222-1296 (fax)
rh@hs-legal.com
Attorney for Dr. Huard

☐ HAND DELIVERY
☐ MAIL DELIVERY
☐ OVERNIGHT MAIL
☐ TELECOPY (FAX)
☒ EMAIL
☒ E-SERVED

DATED: Monday, December 29, 2025.

WAYNE A LAMB – LAW, LLC


By:   /s/ Wayne Lamb
    Wayne Lamb, OSB#211908
    wayne@wlamblaw.com
    Of Attorneys for Plaintiff

**WAYNE A. LAMB LAW, LLC**
183B High St. NE
Salem, OR 97301
Telephone: 503-877-2227
Email: wayne@wlamblaw.com

WL
LAW